**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| *ex rel.* JENNIFER DUCKETT ) | Case No.: 2:25-cv-527 |
| AND SAMANTHA GALLO, ) | |
| ) | **FILED UNDER SEAL** |
| Relators/Plaintiffs, ) | pursuant to 31 U.S.C. §§ 3729 *et seq.* |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| ) | |
| HERITAGE VALLEY HEALTH SYSTEM, INC., ) | |
| NOLAN CHISMIRE, ) | |
| LINDA HOMYK, ) | |
| RONALD LECKEY, ) | |
| MICHAEL BOYD, ) | |
| NORMAN MITRY, ) | |
| ERIN ADAIR PIETROPAOLO, and ) | |
| JENNIFER RING, ) | |
| ) | |
| Defendants. ) | |

## AMENDED COMPLAINT

Jennifer Duckett, R.N., and Samantha Gallo, R.N., ("Relators") on behalf of themselves and the United States, bring this action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, to recover all damages, penalties, and other remedies available under the Act.

## INTRODUCTION

1.      Relators bring this action on behalf of the United States of America against Defendants for treble damages and civil penalties arising from Defendants' false claims in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, ("FCA").

2.      As set forth herein, for years, Heritage Valley Health System, Inc. ("HVHS"), its executives, its supervising physicians, and its nursing managers have enabled and deliberately ignored an Emergency Department ("ED") nurse's diversion and abuse of controlled substances, to the detriment of patients and the United States. Defendants' illegal and fraudulent conduct

57082620.3

consists of knowingly submitting false claims to federal health insurance programs by billing for medications that were diverted and never given to patients, falsely certifying its compliance with the Controlled Substances Act when billing for goods and services, and billing for services that were worthless due to being rendered by a drug-impaired nurse.

3. For at least the last eight years, this nurse, Nolan Chismire, has brazenly stolen controlled substances from HVHS to satiate his known drug addiction.

4. Chismire's conduct is frequent, pervasive, and ongoing. He stole two Valium vials on the evening of April 15, 2025, days before the original complaint was filed in this case. Ongoing observations by Relators throughout 2025 and early 2026 confirmed that Chismire's conduct—and related fraudulent billing—continues unabated by HVHS management, even after DEA agents were known to have visited HVHS to specifically inquire about Chismire.

5. Chismire is frequently high on stolen controlled substances while working his shifts, to the point that he is completely incapable of providing sound healthcare services.

6. Patients have died on his watch, including a 70-year-old female patient who presented to the HVHS-Sewickley ED in late 2024 without a life-threatening condition. That patient died because Chismire failed to provide any attention to her for hours after her arrival, despite her daughter's repeated demands. Chismire, who was high at the time and then rushing to cover his prolonged absence, made a medication error that ultimately killed this Medicare participant.

7. Other patients have suffered adverse, avoidable consequences from his lack of adequate care. For example, Chismire failed to provide adequate care to a 47-year-old male patient in alcohol withdrawal, who then fell and suffered a subdural hematoma. The patient then required

an emergency transfer from HVHS-Sewickley to Allegheny General Hospital for tertiary care to try to save his life.

8.    Patients have suffered extreme pain without any relief, due to Chismire diverting their medications such as valium and morphine for his own use.

9.    Accordingly, any care Chismire has rendered in HVHS-Sewickley's ED, all illegal orders he has made for controlled substances, and all claims submitted for reimbursement for such care and medications are fraudulent.

10.    For at least eight years, HVHS C-suite executives, ED physicians, and ED nursing supervisors have had actual knowledge of Chismire's crimes and done nothing to intervene to stop them.

11.    ED staff nurses and others have taken the following steps, among many others, to make HVHS management and healthcare superiors aware of Chismire's criminal conduct, to no avail:

(a)    ED staff nurses observed Chismire enter the staff bathroom, lock himself inside, and exit the room high—after which ED nurses entered the room to see and photograph a freshly used orange tourniquet, used injectable needle syringes, and empty Valium intravenous vials Chismire had used seconds before to shoot up the stolen controlled substance;

(b)    Within minutes, HVHS nurses then reported their eyewitness accounts and photographic evidence of the tourniquet, syringes, and vials used by Chismire to HVHS Chief Nursing Officer ("CNO") Linda Homyk—who chastised the reporting nurses and ordered them to "stand down" in the face of their explosive evidence of Chismire's brazen criminal conduct;

(c)    Routine reports and multiple internal audits of HVHS's controlled substances show shortfalls, losses, and other suspicious entries—often directly tied to Chismire's electronic-access credentials—that corroborate nurses' frequent visual observations of Chismire's behaviors to steal and use drugs;

(d)    Chismire's own wife, Tina Chismire, who was also an R.N. in the HVHS-Sewickley ED and still works at HVHS-Sewickley, knows of and tearfully reported Mr. Chismire's unbridled addiction in 2022 to Lyndsey Bober,

3

who in turn relayed Mrs. Chismire's statements to CNO Homyk—who took no remedial steps whatsoever; and

(e)    R.N. Lyndsey Bober was part of the group that presented the Chismire drug paraphernalia photos to CNO Homyk on the day of the incident, separately printed and transmitted to CNO Homyk Chismire's illegal controlled substance withdrawals and diversions that same day, and demanded Homyk administer an immediate fit-for-duty drug test on Chismire—and Homyk told Bober to "stand down." Shortly thereafter, Bober quit her full-time ED supervisor position and now works full-time at UPMC-Mercy. Bober remains in a casual staff RN position at the HVHS-Sewickley ED.

12.    Not only have HVHS management and healthcare supervisors not taken steps to stop Chismire's ongoing criminal conduct, but they have also taken additional steps to cover up this criminal conduct—and thereby enable its staggering consequences for patient care and safety:

(a)    HVHS removed a camera from the controlled-substance room so neither management—nor any other person or enforcement body—would have ready photographic evidence of Chismire's criminal conduct;

(b)    HVHS CEO Norm Mitry in 2023 or 2024 cut police staffing in the ED to avoid any investigation of Chismire's theft and diversion of controlled substances, including by not re-signing the contract with the Sewickley Police Department that had enabled the police to maintain a 24/7 presence at HVHS-Sewickley since October 2018; and

(c)    Homyk lied to Pennsylvania State Board of Nursing investigators who arrived at HVHS in 2024 inquiring about Mr. Chismire, advising that HVHS had no evidence of any problems with Mr. Chismire, despite the mountain of evidence in her possession to the contrary.

13.    HVHS and its C-suite executives, ED physicians, and nursing managers have knowingly allowed Chismire's crimes and professional misconduct to continue unabated for at least three primary reasons:

(a)    HVHS's long-time CNO, Linda Homyk, R.N., has known Chismire since he was a child and has chosen to enable his ongoing criminal conduct by protecting him from necessary oversight and disciplinary procedures;

(b)    CNO Homyk and all C-suite executives, physicians, and nursing managers named in this Complaint fear personal criminal and civil charges and penalties, respectively, for their complicity in Chismire's misconduct; and

4

      (c)      CNO Homyk and CEO Mitry, in particular, want to sweep under the rug Chismire's crimes and their massive managerial failures because they were and are angling to benefit from the sale of HVHS to a larger healthcare entity (now known to be Highmark/AHN) and obtain substantial retention/severance packages and monetary bonuses as part of that sale; disclosure of their crimes would undermine the transition and thereby eviscerate the large golden-parachute payments they covet.

14.     Upon information and belief, Mitry approved a bonus of several million dollars for himself after the merger with Highmark/AHN was announced.

15.     In short, Homyk, Mitry, and the defendant physicians and nurses have put their personal, penal, and financial interests over the safety of HVHS patients and defrauded the United States to the tune of tens of millions of dollars in the process.

16.     The FCA and its related regulations provide that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $5,500 [*$14,308 inflation-adjusted in 2025*] and not more than $11,000 [*$28,618 inflation-adjusted in 2025*] for each such claim, plus three times the amount of damages sustained by the government because of the false claims, and attorneys' fees.  28 C.F.R. § 85.3(a)(9).

17.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.  Relators claim entitlement to a portion of any recovery obtained by the United States as *qui tam* Relators/Plaintiffs.  There are no bars to recovery under 31 U.S.C. § 3730(e), and—or in the alternative—Relators are original sources as defined therein.

18.     Based on the FCA, Relators on behalf of the United States Government seek through this action to recover damages and civil penalties arising from the Defendants' submission of false claims for payment or approval to government entities for payment.

5

**JURISDICTION AND VENUE**

19.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

20.     Venue is proper in the Western District of Pennsylvania pursuant to 31 U.S.C. § 3732(a) because acts proscribed by the FCA and complained of herein occurred in this district, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transacted business in this district.

**PARTIES**

21.     Jennifer Duckett, R.N., is an adult individual who was, until recently, employed as a registered nurse by HVHS and is a resident of Pennsylvania.

22.     Samantha Gallo, R.N., is an adult individual employed as a registered nurse by HVHS and is a resident of Pennsylvania.

23.     Relators are the original sources of this information to the United States.  They have direct and independent knowledge of the information on which the allegations are based.

24.     Defendant HVHS is a Pennsylvania not-for-profit corporation operating a hospital system in southwestern Pennsylvania, comprising two hospitals: Heritage Valley Sewickley and Heritage Valley Beaver. The system also includes satellite facilities and fifty physician offices throughout southwestern Pennsylvania, eastern Ohio, and West Virginia.

25.     HVHS's Sewickley location ("HVHS-Sewickley") is a 186-bed acute care facility. Its ED sees between 20,000 and 40,000 patients annually.

26.     Relator Gallo works in the HVHS-Sewickley ED.

27.     Relator Duckett previously worked in the HVHS-Sewickley ED.

28.     Defendant Nolan Chismire, R.N., is a registered nurse employed by HVHS. Chismire works in the HVHS-Sewickley ED.

29.     Defendant Linda Homyk, R.N., is the head of nursing leadership at HVHS.  She holds the titles of Vice President and Chief Nursing Officer/Patient Care Services.

30.     Defendant Ronald Leckey, M.D., is the supervising physician of the HVHS-Sewickley ED.

31.     Defendant Michael Boyd, M.D., is a physician in the HVHS-Sewickley ED.

32.     Defendant Norman Mitry is the President and CEO of HVHS.

33.     Defendant Erin Adair Pietropaolo, R.N., is the Nurse Manager of the HVHS-Sewickley ED.

34.     Defendant Jennifer Ring, R.N. is a nurse in the HVHS-Sewickley ED and the immediate supervisor of Relators.

## RELEVANT LEGAL STANDARDS

### The Federal False Claims Act
### 31 U.S.C. §§ 3729 *et seq.*

35.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government, 31 U.S.C. § 3729(a)(1).  In pertinent part, the FCA states that a person who:

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(c)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

. . .

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

7

transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 [*$14,308 inflation-adjusted in 2025*] and not more than $10,000 [*$28,618 inflation-adjusted in 2025*], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

36.    When a fraud has continued for years and involves numerous individual claims, the FCA and relevant case law allow for statistically valid random sampling of a relevant body of claims to be used to show the incidence (and therefore the loss) over time.

37.    The FCA prohibits both false claims for payments for goods (such as medications not received by patients) and false claims for payments for medically unnecessary or unreasonable services (such as worthless services provided by a reckless drug-addled provider).

38.    Separate from prohibiting claims for goods or services not provided or not necessary, the FCA also prohibits material misrepresentations of compliance with laws designed to support United States Government policy interests.  Thus, even if a good or service is properly provided in fact, it is still a false claim when the provision of such good or service was done in a materially noncompliant manner.  Landmark United States Supreme Court cases make this point clear when unlicensed nurses (even if performing properly) and non-minority contractors (even if performing properly) were billed as licensed nurses and minority contractors because the Government's respective interests in safety and equal opportunity were not protected—and the Government would not have paid, had noncompliance been disclosed.

39.     In extreme instances of fraud, an entire contract can be voided and all payments made thereunder recouped.

### The Federal Healthcare Programs

40.     HVHS receives a significant portion of its revenue from the United States Government through Medicare, Medicaid, and other federal health insurance programs.

### The Medicare Program

41.     The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program") and the supplementary Medical Insurance Program established by Part B ("Medicare Part B Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395 *et seq.* The Medicare Part A and Medicare Part B programs are federally-financed health insurance systems for persons who are aged sixty-five and over and those who are disabled.

42.     HHS has delegated the administration of the Medicare program to the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS.

43.     CMS has Conditions of Participation with which hospitals must comply to participate in and receive payment from Medicare and Medicaid.

44.     CMS regulations establish the Conditions of Participation. *See, e.g.*, 42 C.F.R. §§ 482.1-482.59 (providing participation requirements for Basic Hospital Functions and Optional Hospital Services).

45.     Chief among the Conditions of Participation is that "the hospital must be in compliance with applicable Federal laws related to the health and safety of patients." 42 C.F.R. § 482.11(a).

46.     Additionally, "the hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws." 42 C.F.R. § 482.11(c).

47.     Investigating medical errors and adverse patient events is also a Condition of Participation: "Performance improvement activities must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms that include feedback and learning throughout the hospital." 42 C.F.R. § 482.21(c)(2).

48.     As for nursing services, "[a]ll licensed nurses who provide services in the hospital must adhere to the policies and procedures of the hospital. The director of nursing service must provide for the adequate supervision and evaluation of the clinical activities of all nursing personnel which occur within the responsibility of the nursing service[.]"    42 C.F.R. § 482.23(b)(6).

49.     Drug administration is also addressed in the Conditions of Participation:  "Drugs and biologicals may be prepared and administered on the orders of other practitioners not specified under § 482.12(c) only if such practitioners are acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." 42 C.F.R. § 482.23(c)(1)(i).

50.     Controlled substance handling is subject to a host of Conditions of Participation, such as "Abuses and losses of controlled substances must be reported, in accordance with applicable Federal and State laws, to the individual responsible for the pharmaceutical service, and to the chief executive officer, as appropriate." 42 C.F.R. § 482.25(b)(7).

51.     Hospitals can demonstrate compliance with CMS's Conditions of Participation by being accredited by a national organization called the Joint Commission.

52.    HVHS maintains Joint Commission accreditation to demonstrate compliance with CMS's Conditions of Participation and, consequently, to be eligible to participate in and receive payment from Medicare and Medicaid.

53.    HVHS also relies on its Joint Commission accreditation to remain a licensed hospital in the Commonwealth of Pennsylvania.

54.    In other words, without Joint Commission accreditation, HVHS would have to use another method to represent to CMS that it complies with CMS's Conditions of Participation.

55.    The Medicare Part A Program covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. The Medicare Part B Program provides coverage for a wide range of inpatient and outpatient services, physician and diagnostic services, and for durable medical equipment. The Medicare Part B Program is a 100 percent federally-subsidized health insurance system for persons with disabilities or persons sixty-five years of age or older.

56.    If health care services provided under either the Part A or Part B Program are reasonable and medically necessary, then the United States, through HHS-CMS, reimburses 80 percent of the reasonable cost of the service to either the Medicare beneficiary or the health service provider to whom the beneficiary's claim is assigned.

57.    CMS assigns to private insurance carriers the task of administering and paying Medicare claims. In Pennsylvania, Novitas Solutions, Inc. is the Medicare Administrative Contractor ("MAC"). The MAC reviews and approves claims submitted for reimbursement by health services providers and oversees payment of those claims. The claims are paid with funds of the United States Treasury.

58.    To establish eligibility to receive reimbursement from the Medicare program, CMS requires all hospitals to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-855A Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2B1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . .
>
> **I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**

Medicare Provider Agreement, Sec. 15 (Certification Statement) at ¶¶ 3, 6 (CMS-855A Enrollment Application (07-11)) (emphasis added).

59.    To establish eligibility to receive reimbursement from the Medicare program, CMS requires all physicians to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-8551 Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions  . . . .
>
> **I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**

Medicare Provider Agreement, Sec. 15 (Certification Statement) at ¶¶ 4, 8 (CMS-855I Enrollment Application (07-11)) (emphasis added).

60.    HVHS, as a participant in the Medicare program, signed and submitted to CMS the Medicare Provider Agreement (CMS-855A) and required that its physicians, including Drs.

12

Leckey and Boyd, sign and submit the CMS Medicare Provider Agreement for Physicians (CMS-855I), thereby indicating their agreement to be bound by the laws and regulations governing Medicare reimbursement for services.

61.    Medicare requires providers to submit claims on paper or electronically using universal billing formats.

62.    To submit claims electronically, which most providers (including HVHS) are required to do, a provider must enroll in Medicare's Electronic Data Interchange ("EDI") program. The enrollment process provides for the collection of the information needed to successfully exchange EDI transactions with Medicare and establishes the expectations of the parties to the exchange.  The unique EDI number issued to a provider, along with its password, acts as the provider's electronic signature for claim submission.

63.    As part of the EDI enrollment process, a provider is required to certify, among other things, that "it will submit claims that are accurate, complete, and truthful," that

> it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that **anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law**,

and that "it will research and correct claim discrepancies."  Medicare Claims Processing Manual, Ch. 24, § 30.2 (emphasis added).  To complete its EDI enrollment, a provider representative must "certify that I have been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare Program . . . and to commit the provider to abide by the laws, regulations and the program instructions of Medicare."  *Id.*

64.    Upon information and belief, Defendants made these or similar certifications.

65.     Once an institutional provider, such as HVHS, has been enrolled in the EDI program, the provider submits Medicare claims electronically using CMS Form 8371.  The electronic billing specifications and data elements required by CMS for CMS-8371 are consistent with the data elements present on the CMS UB-04 (CMS-1450) paper claim form.

66.     HVHS, as a participant in the Medicare program, submitted its bills for services to Medicare using the UB-04 (CMS-1450), CMS-8371, or their equivalents, indicating its agreement to be bound by the laws and regulations governing Medicare reimbursement for services, including but not limited to certification of compliance with 42 U.S.C. § 1395y(a)(l)(A) (which prohibits billing for unreasonable or unnecessary goods or services—including goods/services not provided or provided in a worthless, materially noncompliant, or falsely certified manner).

67.     Pursuant to the Medicare Provider Agreements, EDI Enrollment Agreements, UB-04 (CMS-1450), CMS-8371, and/or similar documents, by submitting claims for Medicare reimbursement, Defendants certified to CMS that those claims are for goods and services provided in compliance with federal laws and CMS regulations.

68.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form HCFA-2552, more commonly known as the Hospital Cost Report.  Hospital Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

69.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with Medicare, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(l).  Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to

14

more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, & 413.64(f)(1).

70.    HVHS was and is, throughout Chismire's tenure, up to and including the present, required to submit Hospital Cost Reports to Medicare.

71.    Under the rules applicable at all times relevant to this Amended Complaint, Medicare—through its fiscal intermediaries—had the right to audit the Hospital Cost Reports and financial representations made by HVHS to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

72.    Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

73.    Since September 30, 1994, Medicare cost reports have required the following certification provision:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form CMS-2552-92.

74.    In or about 1996, the Hospital Cost Report was revised to include the following notice:

> **Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.** Furthermore, if services identified in this report . . . were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Form CMS 2552-10 (emphasis added).

15

75.     Defendants were at all times familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

76.     At all times material to this Amended Complaint, Hospital Cost Reports submitted by HVHS were signed by the chief financial officer or other hospital official who attested, among other things, to the certification quoted above.

77.     To obtain Medicare reimbursement under Part B, providers submit claims using a form known as a CMS Form 1500 or the electronic equivalent.  Among the data the provider includes on a CMS Form 1500 are certain five-digit codes, known as Current Procedural Terminology codes, or "CPT codes," that identify the services rendered and for which the provider seeks reimbursement.

78.     By submitting the CMS Form 1500, providers expressly certify that:

> 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and Medicaid laws, regulations, and program instructions for payment, including but not limited to the Federal anti-kickback statute and the Physician Self Referral law (commonly known as the Stark law); 5) the services identified on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations . . . .

79.     Federal law obligates every provider to return to the United States any payment that it improperly receives.  A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.

80.     It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs.

16

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

42 U.S.C. § 1320a-7b(a).

### The Medicaid Program

81.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

82.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FFP").  42 U.S.C. §§ 1396, *et seq*.

83.    The state directly reimburses physicians for services rendered, with the state obtaining the federal share of the payment from accounts that draw on funds of the United States Treasury.  42 C.F.R. §§ 430.0-.30.  The federal share of each state's Medicaid program varies among the states.

84.    Enrolled providers of medical services to Medicaid recipients, including HVHS, are eligible for reimbursement for covered medical services under the provisions of Title XIX of the 1995 Amendments to the Federal Social Security Act.  By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information by Medicaid. To receive Medicaid funds, enrolled providers (together with authorized agents, employees, and contractors) are required to abide by all the provisions of the Social Security Act, the regulations

17

promulgated under the Act, and all applicable policies and procedures promulgated by the relevant state agency responsible for administering the Medicaid program.

85.    As with Medicare, a "claim" under Medicaid is only reimbursable if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 C.F.R. § 402.3.

86.    Also similar to Medicare, Medicaid does not intend to pay for goods or services not provided or provided in a worthless, materially noncompliant, or falsely certified manner.

**TRICARE/CHAMPUS**

87.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.  *Id.*

88.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS.  *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

89.    TRICARE's governing regulations (like Medicare's and Medicaid's requirements) also are based upon "medical necessity."  TRICARE's governing regulations require that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care."  *Id.*   In this

18

respect, similarly to Medicare and Medicaid, services provided in a reckless manner or below professional standards are improper and violations of TRICARE.  *Id.*

### Federal Employee Health Benefits Program

90.    The Federal Employee Health Benefits Program ("FEHBP") is a federally-funded medical insurance program for federal employees, retirees, their spouses, and unmarried dependent children under age twenty-two that is administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.*  Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees.  Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund") and are administered by OPM.  5 U.S.C. § 909.  Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums.  5 U.S.C. § 8906.  The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

91.    Like Medicare, Medicaid, and TRICARE, FEHBP will not cover any treatment that is not reasonable or not providing actual value to a participant.  5 U.S.C. § 8902(i).

92.    Also similar to Medicare, Medicaid, and TRICARE, FEHBP does not intend to pay for goods or services not provided or provided in a worthless, materially noncompliant, or falsely certified manner.

### Controlled Substances Act

93.    The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.*, and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States.  From the outset, Congress recognized the importance of preventing the diversion and abuse of drugs from legitimate to illegitimate uses.  The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture,

19

distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.  21 U.S.C. § 841(a).

94.    The CSA categorizes controlled substances in five "Schedules."

95.    Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."  21 U.S.C. § 812(b)(2).

96.    Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence."  Schedule III drugs also have "a currently accepted medical use."  21 U.S.C. § 812(b)(3).

97.    Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.  21 U.S.C. § 812(b)(4).

98.    The CSA requires those who manufacture, distribute, or dispense controlled substances, including hospitals, to obtain a registration from the Drug Enforcement Administration ("DEA").  21 U.S.C. § 822(a)(1).

99.    At all times while Chismire was and is employed by HVHS, HVHS had and has an active registration with the DEA to dispense Schedule II-V controlled substances.

100.    The DEA registration authorizes HVHS to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner."  21 U.S.C. §§ 823(f), 802(10).

101.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a nurse employed by a registered hospital like HVHS, are not

required to register with the DEA, "if such agent or employee is acting in the usual course of his business or employment." 21 U.S.C. § 822(c)(1).

102. Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a). Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner. 21 U.S.C. § 829(b).

103. Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

104. A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (emphasis added).

105. Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances. *Id.* (emphasis added).

106. The CSA classifies morphine, buprenorphine, lorazepam, oxycodone, hydromorphone, and diazepam, among other things, as controlled substances.

107. The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized. 21 U.S.C. § 841(a)(1).

21

108.    A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."  21 U.S.C. § 822(b).

109.    The CSA and its accompanying regulations also detail certain methods registrants must use to dispose of controlled substances.

110.    Title 21 Code of Federal Regulations, section 1317.95(d) provides, in pertinent part, that:

> [i]f the controlled substances are destroyed at a registrant's registered location utilizing an on-site method of destruction, the following procedures shall be followed:
>
> (1) Two employees of the registrant shall handle or observe the handling of any controlled substance until the substance is rendered non-retrievable; and
>
> (2) Two employees of the registrant shall personally witness the destruction of the controlled substance until it is rendered non-retrievable.

C.F.R. § 1317.95(d).

### Pennsylvania Statutes and Regulations

111.    Only licensed physicians or those authorized by the State Board of Medicine—not nurses—may prescribe controlled substances.  *See* 49 Pa. Code §16.92.

112.    Hospitals must report "incidents" and "serious events" to the Patient Safety Authority within ninety days of their occurrence.  *See* 44 Pa. Bull. 6178 (Sept. 27, 2014) (Final Guidance for Acute Healthcare Facility Determinations of Reporting Requirements under the Medical Care Availability and Reduction of Error ("MCARE") Act).

113.    The MCARE Act defines an "incident" as "an event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient

22

but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient." 40 Pa. Stat. § 1303.302.

114. The MCARE Act defines a "serious event" as "an event, occurrence or situation involving the clinical care of a patient in a medical facility that results in death or compromises patient safety and results in an unanticipated injury requiring the delivery of additional health care services to the patient." *Id.*

115. HVHS's Event Reporting Policy references the MCARE Act. *See* Exhibit 1, HVHS Event Reporting Policy, at 4.

116. HVHS must abide by the Drug Administration Procedures for Nursing Services provided in hospitals. 28 Pa. Code §§ 109.61-68.

117. These Drug Administration Procedure regulations include, but are not limited to, the following requirements:

    (a)    28 Pa. Code § 109.61:  Medication or treatment shall be administered only upon written and signed orders of a practitioner and in accordance with the provisions of §§ 107.61--107.65 (relating to medical orders);

    (b)    28 Pa. Code § 109.62:

        (a) Each dose of drug shall be recorded in the medical record of the patient and properly signed after the drugs have been administered;

        (b) Any medication error or apparent drug reaction shall be reported immediately to the practitioner who ordered the drug.  Any entry of the medication given in error or the apparent drug reaction, or both, shall be properly recorded in the medical record of the patient; and

    (c)    28 Pa. Code § 109.65:  Disposable syringes and needles shall be maintained in hospital-approved locations which provide adequate security, and access shall be available only to authorized personnel.  Provision shall be made for disposable syringes and needles to be destroyed or otherwise rendered unusable and inaccessible immediately following their use.

23

## MATERIAL FACTS

### Relators are R.N.s Who Work at HVHS and Have Excellent Training

118.    Relators are registered nurses who have worked for HVHS in the HVHS-Sewickley ED.

119.    Relator Gallo earned a bachelor's degree in nursing from Waynesburg University in 2022.

120.    Gallo worked as an Emergency Room nurse at Ruby Memorial Hospital and Uniontown Hospital from 2021 through 2023.

121.    Gallo began working in the HVHS-Sewickley ED in January 2024 and continues to work there full-time.

122.    Relator Duckett has nearly two decades of emergency room nursing experience.

123.    Duckett earned a nursing degree from Norwich Military University in 2008.

124.    Duckett has worked in the trauma ICU at Dartmouth, the emergency room at Massachusetts General Hospital in Boston, and in life flight medicine at Duke University Medical Center.

125.    Duckett began working in the HVHS-Sewickley ED in 2021.

126.    Through the COVID-19 pandemic and many overtime shifts, Duckett approached her job in the HVHS-Sewickley ED with significant experience and a willingness to take on more hours than were required for her to assist the team when it was short-staffed.

127.    Duckett would have continued on this successful trajectory had Defendants not taken increasingly hostile retaliatory action against her because of her whistleblowing, which included ignoring her reports on Chismire, chastising her without cause including yelling at her in front of other staff, creating adverse working conditions to unnecessarily stress her (indeed driving

24

her to seek a leave of absence), and then surreptitiously terminating her employment sometime in 2025 while she was on that approved leave of absence.

### Chismire's History of Drug Abuse and Related Misconduct Raised Obvious Red Flags for HVHS and CNO Homyk from the Start of His Employment

128.    Chismire maintains a professional nursing license from the Commonwealth of Pennsylvania's Bureau of Professional and Occupational Affairs, numbered RN606383.

129.    Chismire has worked in the HVHS-Sewickley ED since 2017.

130.    CNO Homyk and CEO Mitry knew or should have known the details of Chismire's prior controlled substance addiction before they hired him as an R.N. and put him to work in the HVHS-Sewickley ED.

131.    Mitry, as President and CEO of HVHS, had the ultimate responsibility to oversee corporate compliance.

132.    Mitry signed and distributed to all of his managers, including CNO Homyk, an HVHS policy concerning an Internal Audit Plan that had the express purpose of identifying potential areas of high risk.  *See* Exhibit 2, HVHS Internal Audit Plan.

133.    Mitry identified "major changes in . . . staff" as a known risk factor, particularly those who worked in highly regulated operations and/or operations subject to a high level of public scrutiny. *See id.* at 2.

134.    The management of controlled substances represents a highly regulated operation, subject to DEA oversight, among other federal and state authorities.

135.    Mitry further noted in the policy concerning the Internal Audit Plan that risk factors identified could result in "risk of financial loss."  *See id.* at 2.  Indeed, failure to comply with the CSA can result in fines of up to $500,000 for knowing violation and jail time up to life in prison for the most egregious abuse.

25

136.    At the time of his hiring at HVHS, Chismire posed a major risk factor based on his own self-assessment as found in relevant and publicly available Pennsylvania State Board of Nursing files.

137.    In the public record available to HVHS in 2017, Mr. Chismire admitted that he was an addict and that his addiction to controlled substances started no later than February 2010 when he began abusing Xanax (a Schedule IV controlled substance).  Mr. Chismire also admitted self-medicating with alcohol and quickly becoming addicted to opiates.  *See* Exhibit 3, *In re Pet. for Reinstatement of the License to Practice Pro. Nursing of Nolan Daniel Chismire, RN*, Final Order Adopting Hr'g Examiner's Proposed Mem. Decision and Substituting Bd. Order, No. 0061-51-14 at 23 (Pa. State Bd. of Nursing, Nov. 12, 2014).

138.    By his further admission, Chismire's addiction arose about the same time he obtained his nursing license in or around July 15, 2009, and took his first nursing job at Villa St. Joseph in Baden, PA in the summer of 2009.  *Id.*

139.    Chismire's employment at Villa St. Joseph lasted **just** **eight** **months**.  Villa St. Joseph terminated his employment for his excessive "smoke breaks," general tardiness, and suspected drug diversion and addiction.  *Id.*

140.    Chismire admitted his drug addiction took flight at Villa St. Joseph.  *Id.*

141.    Notwithstanding his drug addiction and related professional misconduct, Chismire managed to find new employment at Allegheny General Hospital in 2010 in the progressive care unit.  *Id.*

142.    Chismire's employment at AGH lasted approximately **five** **weeks**, during which time, by his admission, Chismire diverted opiate and benzodiazepine-based narcotics (Schedule II and IV controlled substances) for unlawful personal use on "about three occasions."  While at

AGH, Chismire diverted two four-milligram morphine vials, one ampoule of Fentanyl, and two four-milligram vials of Ativan for his personal use. *Id.* at n.3.

143. Chismire admitted to the State Board of Nursing that, in addition to stealing from AGH, he frequently obtained Xanax and "any and all opiates from Vicodin to heroin" off the streets. *Id.* at 3.

144. On December 20, 2010, AGH terminated Chismire for suspected diversion of narcotics. *Id.*

145. Thereafter, AGH reported Chismire and his diversion to the State Board of Nursing, as appropriate under relevant laws and regulations governing abuse and diversion of controlled substances. *See* Exhibit 4, *Commonwealth of Pennsylvania, Bureau of Prof. and Occupational Affairs v. Nolan Daniel Chismire, R.N.*, Final Adjudication and Order, No. 0674-51-12 at 3 (Pa. State Bd. of Nursing, Dec. 12, 2012).

146. At the direction of the Pennsylvania Nurse Peer Assistance Program ("PNAP"), Chismire stopped practicing as a professional nurse at the end of February 2011 and began treatment for his addiction at Gateway Rehabilitation Center. *See* Ex. 3 at 4.

147. Although Chismire attended intensive outpatient treatment, inpatient treatment, and again, intensive outpatient treatment at Gateway, he continued to relapse on morphine. *Id.*

148. Chismire's active and debilitating addiction caused him financial distress. At one point, he broke into his parents' house while they were away on vacation and stole from them to fund his addiction. *Id.*

149. Chismire's mother filed criminal charges against him, for which he was arrested. Chismire remained in jail for thirty-two days until his mother agreed to drop the charges in or about the spring of 2012 when Chismire agreed to enter a fourteen-month residential program. *Id.*

150.    Chismire entered the program on April 6, 2012 and completed the program on May 31, 2013.  *Id.*

151.    HVHS, Mitry, and Homyk—consistent with HVHS corporate compliance procedures for assessment of staff risk—knew at the time of Chismire's hiring at HVHS that Chismire had an ongoing addiction to morphine and other narcotic drugs.

152.    Not only did Homyk and Mitry know of Chismire's substantial and highly risky drug addiction at the time of his hiring, they also knew of Chismire's proclivity to deceive and refuse to cooperate with authorities investigating his criminal misconduct.

153.    On October 20, 2011, shortly after AGH reported Chismire's drug diversions to the Board of Nursing ("the Board") in 2011, the Pennsylvania Bureau of Professional and Occupational Affairs presented to the Board a Petition for Mental and Physical Examination of Chismire ("the Petition").  *See* Ex. 4 at 2.

154.    The Petition alleged that "probable cause existed to believe that [Chismire] was unable to practice professional nursing with reasonable skill and safety to patients by reason of mental or physical illness or condition or psychological dependence upon alcohol, hallucinogenic or narcotic drugs or other drugs which tend to impair judgment or coordination, pursuant to Section 14(a)(2) of the [Pennsylvania Professional Nursing Law], 63 P.S. § 224(a)(2)."  *Id.*

155.    Chismire systematically dodged the Commonwealth's Petition and prevented the Board from reviewing his capacity to practice nursing with reasonable skill and safety to patients.

156.    Chismire failed to provide relevant records.  *Id.* at 3.

157.    Chismire failed to submit to a mental examination.  *Id.*

158.    Chismire failed to submit to a physical examination.  *Id.*

159.    The Commonwealth repeatedly advised Chismire in 2011-2012 that his refusal to submit to examinations would result in a legal finding that he was unable to practice professional nursing as a result of his addiction to alcohol, narcotic drugs, and other drugs.  Still, Chismire refused to cooperate.  *Id.* at 3-6.

160.    Accordingly, in 2012, the Board found substantial evidence that Chismire was unable to practice professional nursing with reasonable skill and safety due to his drug addiction. *Id.* at 12.

161.    On December 12, 2012, the Pennsylvania State Board of Nursing suspended Chismire's nursing license indefinitely, retroactive to June 5, 2012.  *Id.* at 14.

162.    Specifically, the Board held that "[t]he public can only be protected by the Board's issuing an order indefinitely suspending [Chismire's] license until such time as he submits to a drug and alcohol evaluation by a Board-approved provider and demonstrates at a hearing that he can resume a competent practice of professional nursing with reasonable skill and safety to patients." *Id.* at 13.

**HVHS Knew of or Had Reason to Know at the Time It Hired Chismire that His Employment Would Require Close Supervision and Stringent Restrictions to Keep Controlled Substances Out of His Reach to Ensure Patient Safety and Comply with Federal and State Legal Requirements**

163.    Roughly six (6) months after completing the residential rehabilitation program, in December 2013, Chismire petitioned the Board for reinstatement, and thereafter appeared at a formal administrative hearing in Harrisburg, PA, on March 31, 2014.  *See* Ex. 3 at 22.

164.    On November 12, 2014, the Board approved Chismire's reinstatement request subject to stringent conditions to ensure Chismire would not have the opportunity to relapse and return to his past criminal and dangerous behavior of diverting drugs.  *Id.* at 1-19.

165. The Board entered a final order that removed Chismire from suspended status to licensed status, subject to a three-year probation period where the Professional Health Monitoring Program's ("PHMP's") Disciplinary Monitoring Unit would oversee his conduct (the ¨Probation Order¨). *Id.* at 1.

166. Hence, Chismire remained on probation and subject to the Probation Order at all times material between November 12, 2014, to November 12, 2017.

167. Among other requirements, the Probation Order required Chismire to abide by and obey all laws of the United States, including but not limited to the CSA. *Id.* at 2.

168. Further, the Probation Order required Chismire to completely abstain from the use of any controlled substances, mood-altering drugs, and alcohol in any form. *Id.* at 8-9.

169. In addition, the Probation Order required Chismire to "submit to random unannounced and observed drug and alcohol tests (drug testing), inclusive of bodily fluid, breath analysis, hair analysis or another procedure as may be directed by the PMHP for the detection of substances prohibited under [the Probation Order] as directed by the PMHP." Chismire's failure to provide a specimen or sample would violate the Probation Order and lead to the immediate suspension of Chismire's provisional license. *Id.* at 9, 14.

170. Through November 12, 2017, the Protective Order prohibited Chismire from practicing in any capacity that involved the administration of a controlled substance. *Id.* at 10.

171. Through November 12, 2017, the Protective Order prohibited Chismire from acting as a supervisor to any other person. *Id.*

172. Through November 12, 2017, the Probation Order prohibited Chismire from practicing in an emergency room, operating room, intensive care unit, or any other such unit where he would have access to controlled substances. *Id.* at 10-11.

173.    The Probation Order restricted Chismire's employment by providing that he could not work in any practice setting without direct supervision, which the Board defined to mean "the physical presence of the supervisor on the premises so that the supervisor is immediately available" to supervise Chismire's conduct. *Id.* at 11.

174.    Further, the Probation Order required that—through November 12, 2017—any party hiring Chismire perform an evaluation of his work performance on a 90-day or more frequent basis. *Id.* at 12.

175.    In addition, Chismire had the affirmative duty under the Probation Order to provide the order to any employer hiring Chismire during the probation period. *Id.* at 11-12.

176.    The Board imposed that condition so an employer would also conduct itself in compliance with the Probation Order to ensure patient safety.

177.    In 2017, **while Chismire was still subject to the Probation Order**, Homyk and HVHS hired Chismire as a nursing assistant on the medical surgical unit.

178.    Further, Homyk had actual knowledge of Chismire's history through her son-in-law, John Bober (married to Homyk's daughter), who also worked at HVHS as an R.N. at all times material to this Amended Complaint, and Homyk knew that Bober counted Chismire among his closest friends.

179.    Moreover, a perfunctory Google search for Nolan Chismire would have raised red flags.

180.    To this day, Chismire publicly hosts a website on which he describes himself as a drug addict. *See* Exhibit 5, About the Owner - Nolan's Sharpening Service, https://nolansharpening.com/about-the-owner/ (last visited Feb. 24, 2026).

31

181.   Chismire also posted approximately twenty or thirty business cards listing a link to his website throughout HVHS-Sewickley, broadcasting his addiction history to his colleagues in the ED.  Duckett gave these business cards to Pietropaolo, Boyd, and two Physician Assistants, telling them to read what Chismire admitted publicly.

182.   Notwithstanding Homyk's understanding of Chismire's addiction problems and the obvious risk he posed to patient safety—and in violation of the Probation Order—, she and Mitry assigned Chismire to work in departments like medical-surgical and the ED, where he had immediate, routine, and often unobserved access to controlled substances.

183.   Similarly, Homyk did not subject Chismire to random testing—or any testing whatsoever—as the Probation Order required.

184.   Homyk did not order evaluation of his work performance every 90 days or more regularly, as the Probation Order required.

185.   Chismire had open access to controlled substances and free rein to come and go as he pleased, all at the expense of patient safety.

186.   On November 30, 2017, unaware that Chismire was working at HVHS in these manners that violated the Probation Order, the State Board of Nursing granted Chismire's petition to reinstate his nursing license.  *See* Exhibit 6, *In re Application for Reinstatement of the License of Nolan Daniel Chismire, RN*, Final Order Reinstating Respondent's License, No. 2303-51-2017 at 1 (Pa. State Bd. of Nursing, Nov. 30, 2017).

187.   Since then, Chismire has worked as a nurse in the ED at HVHS-Sewickley.

**The Defendants' Knowledge and Concealment of Chismire's
Drug Diversion and Illicit Conduct**

188.   HVHS was aware of Chismire's history of drug abuse when it hired him and also has current, actual knowledge of his drug abuse and diversion—and has covered it up.

189. Despite Chismire's long, public history and the numerous reports made internally within HVHS in the years following his last reinstatement, Chismire has never been subjected to a fit-for-duty drug test by Defendants.

190. Relator Gallo has first-hand knowledge of Chismire's drug diversion and has reported it to Homyk on multiple occasions.

191. In the HVHS-Sewickley ED, controlled substances are kept in a locked room in locked drawers inside a Pyxis medication station designed to help clinicians safely and efficiently dispense medications.

192. Until late 2024 or early 2025, a security camera sat affixed in the controlled substances room to record use of the Pyxis system and controlled substances.

193. Relator Duckett saw that, when the Joint Commission came to inspect HVHS-Sewickley in 2024, the camera in the medication room was present.

194. Relator Duckett also witnessed that the camera was taken down again right after the Joint Commission inspection concluded.

195. By early 2025, after numerous and repeated reports to the defendant-managers concerning Chismire's misconduct, HVHS-Sewickley removed the security camera.

**Chismire's February 2024 Diversion of Valium by Pretending to Waste it**

196. Specifically, in February 2024, Chismire asked Gallo to perform a valium "waste" with him. Valium is a controlled substance.

197. HVHS has a Controlled Substances policy, Policy Number 41 (the "CS Policy"). The policy applies to the pharmacy and nursing departments at HVHS. *See* Exhibit 7, HVHS CS Policy, at 1.

33

198. In the CS Policy, HVHS plainly identifies its purpose: "To ensure adequate controls, dispensing and accountability of all controlled substances in conformity with state and federal regulations." *Id.*

199. The CS Policy has a section identified as "Control Substance Waste." *Id.* at 2.

200. The CS Policy defines "waste" as a dose or partial dose of a controlled drug, [C-II through C-V], not administered to the patient, including substances with broken integrity of the package or medication." *Id.*

201. The CS Policy requires that the wasting of all controlled substances be witnessed by another clinician. *Id.*

202. The CS Policy also requires that two licensed employees document the controlled substance wasted as outlined in the Patient Care Policy. *Id.*

203. To unlock a Pyxis drawer containing controlled substances, a nurse must first provide a personal fingerprint and matching individual employee identification number to self-identify. Then, he or she must insert the name of the medicine, the name of the patient to whom it was prescribed, the amount of medicine needed, and (if applicable) the amount to waste.

204. A Controlled Substance waste is only properly executed at the time of initial withdrawal of controlled substances if less medication is prescribed for a patient by the doctor than the (higher) dose amount that is the only one available.

205. For example, 0.5 mg of hydromorphone intravenous may be ordered by the doctor for a patient, but hydromorphone only comes in 2 mg vials. Therefore, the nurse must waste 1.5 mg of the hydromorphone to only have 0.5 mg to take to a patient room.

206. The waste procedure is specifically designed to avoid the possibility of and temptation for diversion of the 1.5 mg hydromorphone that would be left over if it were not immediately destroyed or rendered unusable.

207. If wasting is to occur, the Pyxis access and waste procedure must be completed with both a nurse performing the waste and an observing nurse present. *See* 21 C.F.R. § 1317.95.

208. The observing nurse does the following in a Controlled Substance waste:

    (a) Accompanies the attending nurse (who will perform the wasting procedure) into the controlled substances room;

    (b) Observes the attending nurse's drawer login procedure;

    (c) Observes the medicine coming from the drawer;

    (d) Observes the uncapped vial of medicine;

    (e) Observes the attending nurse withdraw the prescribed amount for patient use;

    (f) Observes the attending nurse put the unused remaining medicine into a drug waste receptacle; and

    (g) Separately logs into the Pyxis with the observing nurse's own fingerprint and employee number to verify in the Pyxis records that the correct amount was immediately wasted, leaving the correct amount for the medication to be administered.

209. The entire waste process, when done correctly, takes approximately ten seconds.

210. When Chismire asked Gallo to observe him waste the Valium, he already had the Valium vial in the pocket of his uniform, a violation of the CS Policy.

211. Gallo did not witness Chismire enter the controlled substances room, log in to the locked drawer, withdraw the Valium, or uncap the vial.

212. Without seeing Chismire perform the proper waste procedure, Gallo could not be certain that Chismire had not taken the Valium for his own use and filled the vial with something else, such as clear saline solution.

35

213.    HVHS also has a Medication Event Management Policy (the "MEM Policy"), which has been in effect since May 2001.  *See* Exhibit 8, HVHS MEM Policy.

214.    The MEM Policy requires that the entire HVHS workforce will provide safe medication administration.  The policy further provides that anyone discovering a so-called medication event must report it in "timely fashion" and also promises that disciplinary action will occur when employees violate the law or relevant policies through "intentional act," "impairment," or "disregard of policy."  *Id.* at 1.

215.    The MEM Policy defines a medication event as "an episode in drug misadventuring that should be preventable."  For example, a medication event can occur during "procurement," such as when there is a gap or inconsistency in the "provenance" of possession, storage, or other handling of a controlled substance.  *Id.*

216.    Provenance, when used in the medical context, means data and/or procedure integrity and transparency, so a medical procedure or process is fully sourced and understood through access to and/or observation of all relevant information needed to ensure a desired outcome.  (It is quite similar to the legal concept of chain of custody.)

217.    Chismire violated both the CS Policy and the MEM Policy by asking Gallo to waste Valium, a controlled substance, without Gallo observing all the relevant steps in the procurement process.

218.    At the time of the February incident, Gallo had just started working in the HVHS-Sewickley-ER and had immediate concerns about Chismire's disregard of proper wasting procedures in violation of relevant HVHS policies.

**Chismire's March 2024 Diversion of 10 Valium Vials**

219.    In March 2024, Chismire asked Gallo to waste Valium with him again.

36

220.    Similarly to the February 2024 Valium waste, Chismire already had the Valium vial in his pocket.

221.    Gallo did not witness Chismire perform the required procedures, as required by HVHS policies and healthcare industry standards.

222.    Concerned about Chismire's disregard for proper handling of controlled substances, Gallo checked what orders, if any, the attending physician had written for the patient for whom Chismire said he withdrew the Valium.

223.    What Gallo found was shocking.  The patient was a thirty-two-year-old female complaining of abdominal pain, a condition for which Valium would provide no relief.

224.    Equally disturbing, Gallo also found that no doctor had prescribed Valium for this patient.

225.    Further, Gallo found that Chismire had "overridden" Valium in the locked drawer's login system; meaning that, to obtain the Valium, Chismire—**not a prescribing physician**—had typed the medicine into the electronic medical record so that he could retrieve it for his own addiction purposes, as opposed to in accordance with a doctor's order for clinical use for that patient.

226.    Chismire entered an override for an order for ten vials of Valium, entering a false claim that Dr. Arjamon Deb had ordered the drugs.

227.    Nurses shall not put in orders for narcotics or benzodiazepine unless there is an emergency code situation, meaning a patient is at imminent risk of death.  ED physicians are the providers who prescribe these controlled substances as licensed and practicing medical doctors with valid DEA registration numbers.

228.    Nurses in Pennsylvania do not prescribe medications because they are not authorized to do so with only a nursing license.  Likewise, such nurses do not register with the DEA because they are not licensed to prescribe controlled substances.

229.    If a nurse does place an order into the system for a narcotic in an exigent circumstance, to comply with relevant federal and state law and HVHS policies, a doctor must thereafter access the system and validate that the medicine is necessary, using the doctor's own signature and credentials.

230.    A few days after the ten-vial shortage of Valium was discovered, Defendant Pietropaolo, the supervising nurse, asked Dr. Deb, who was working in the ED, to electronically sign off on Chismire's override that allowed those ten Valium vials to be dispensed.

231.    No medical doctor had actually ordered the ten vials of Valium that Chismire obtained via his override.

232.    Dr. Deb refused to verify and electronically sign Chismire's improper Valium order because he knew that neither he—nor any other ED doctor—had told Chismire to obtain ten Valium vials for any ED patients.  To the contrary, on the day in question, Dr. Deb during his twelve-hour shift had made just one order for a single Valium vial.

233.    Upon information and belief, to conceal Chismire's misconduct, diversion, and fraudulent billing as well as to evade a DEA audit of missing controlled substances, the ED's supervising physician, Defendant Dr. Ronald Leckey, has "verified" Chismire overrides to conceal Chismire's fraudulent conduct (including the specific instance noted above that Dr. Deb refused to sign).

234.    Upon information and belief, Dr. Leckey has verified Chismire overrides even on days when Dr. Leckey was not even working in the ED.

235. The CS Policy (and federal law) requires HVHS to report known or suspected theft of any controlled substance, such as Valium.

236. Gallo immediately reported the March 2024 violation of controlled substance handling procedure to her immediate supervisor in the ED, Defendant Jennifer Ring, R.N.

237. Ring instructed Gallo not to mention the breach of controlled substance handling procedures to anyone. Ring also failed to complete a DEA Form 106 (which is required to report the loss of a controlled substance).

238. Approximately one hour later, Ring told Gallo that CNO Homyk wanted to speak with her in private.

239. Gallo met with Homyk in a private meeting space on the first floor of the hospital.

240. No one else was present at their meeting.

241. Homyk asked Gallo to recount her experience with Chismire and took notes.

242. Homyk thanked Gallo for reporting the incident and told her that Homyk had received other reports of controlled substance handling breaches by Chismire and had been "investigating him for a long time."

243. Homyk also told Gallo that she had "evidence" of Chismire's criminal behavior and that he would be offered rehabilitation before being fired or having his license revoked.

244. Like Ring, Homyk instructed Gallo not to tell anyone about what she had seen Chismire do with the Valium. Like Ring, Homyk also failed to complete a DEA Form 106 to report to federal authorities Chismire's known drug diversion.

245. Indeed, Homyk did absolutely nothing to address Gallo's eyewitness report of blatant drug diversion.

**Chismire's April 2025 Diversion of Valium**

246.    On the evening shift of April 15, 2025, Gallo again encountered Chismire's drug diversion.

247.    By 9:30 PM on April 15, 2025, two vials of Valium that were present earlier in the day were unaccounted for.

248.    Chismire was working the 3:00 PM to 1:00 AM shift with Gallo and other nurses from April 15 to April 16.

249.    During that shift (during which Chismire and Gallo were working in the same pod), Chismire enlisted a nurse named Lauren Ny to waste with him.

250.    Gallo approached Ny after the waste and asked her if it had been a "normal waste." Ny replied that it was not.

251.    Despite Gallo and other nurses not wasting with Chismire, Chismire nonetheless accessed the Pyxis machine and stole two vials of Valium.

252.    Upon information and belief, Chismire falsely attributed the Valium to a doctor's order for a patient, which continued his pattern of creating false claims for reimbursement for both diverted drugs and his worthless nursing services that were also materially noncompliant with CMS certification requirements.

253.    Upon information and belief, the HVHS Pharmacy has attempted to track Chismire's diversions, but has been ordered by Mitry and Homyk to not report Chismire to the DEA, the State Nursing Board, or any other authority that could stop these crimes and frauds.

254.    HVHS has conducted audits of some of the controlled substances suspected of being diverted, dispensed improperly, or otherwise adulterated by Chismire and confirmed that they were missing.

255.    HVHS failed to notify the DEA of any of the reports of diversion or even of the confirmed audit results demonstrating missing controlled substances.

256.    HVHS failed to notify CMS of the diversions and took no effort to investigate or retract claims or return payments received for controlled substances billed to patients covered by Government insurance despite knowing that the drugs were missing and were actually consumed by Chismire.

257.    Even after its internal audits corroborated numerous reports of HVHS's CSA failings and violations, HVHS took no action to correct its numerous prior false certifications of full compliance with all federal laws (including the CSA) in the millions of dollars of claims/payments generated by the ED at HVHS-Sewickley that were only paid by the Government because of such material certifications of compliance.

258.    Indeed, HVHS took no action in response to the results of the audits.

**Relator Duckett Has Observed Chismire's Drug Diversion and HVHS Cover-Up**

259.    Duckett has also witnessed Chismire waste drugs improperly.    Specifically, Chismire asked Duckett to waste Suboxone with him.

260.    The Suboxone pill packaging was already open, in violation of controlled substance handling procedures.

261.    Duckett looked up orders for Suboxone and found that no one had ordered it for the alleged, intended recipient, *i.e.*, a teenage patient complaining of ankle pain.

262.    Chismire falsified the medical record to reflect that the Suboxone had been prescribed for the teenage patient diagnosed with a sprained ankle.

263.    Suboxone is a medication for opioid withdrawal that is almost never administered in an emergency room setting, much less to a teenager with **no addiction history or withdrawal symptoms who is complaining of a sprained ankle.**

264.    Even if a patient presented to the ED with symptoms of opioid withdrawal, the standard of care in an ED setting requires hospital staff to direct the patient to visit a suboxone clinic for prescribed dosing.  Industry standards indicate that only in rare cases will ED doctors use the limited supply of suboxone in an ED to treat acute symptoms of opioid withdrawal, typically when other medical issues are also present.

265.    After Duckett witnessed Chismire's blatant act of drug diversion in violation of the CS Policy, MEM Policy, and federal and state law, Chismire left the ED without notice or comment for a "break" and returned over forty minutes later.

266.    When Chismire returned to work, he appeared to Duckett to be high—he was sweating profusely, sleepy, and unfocused.

267.    Upon information and belief, Chismire took the Suboxone himself during his unapproved "break," consistent with his behavior dating back to his truncated employment at Villa St. Joseph in 2009.

268.    Duckett reported the improper Suboxone waste to Ring and Pietropaolo, but neither nursing supervisor did anything to address the real-time diversion and Chismire's intoxicated state.

269.    In fact, Ring yelled at Duckett to assign herself more patients to cover up for Chismire's absence—he had been gone for an hour and a half.

270.    Ring often yelled at Duckett in front of other nursing staff throughout Duckett's tenure at HVHS-Sewickley.

271.    Nor did Ring or Pietropaolo prepare a DEA Form 106, in violation of HVHS policies and federal and state law.

272.    Relators have observed Chismire high during his shifts on numerous occasions, which continue to this day.

**HVHS Has Intentionally Ignored Voluminous Reports of Chismire's
Drug Diversion and Addictive Behavior**

273.    Duckett has observed Chismire disappear during his shift for unauthorized, extended breaks of approximately forty minutes, even when he has patients assigned to his care.

274.    Duckett recalls hundreds of instances where doctors and nurses were looking for Chismire everywhere in the ED because patient care was not being provided for an hour or more while patient and family complaints inundated the nursing supervisors.  No one could find Chismire during these extended breaks.

275.    At Villa St. Joseph, Chismire's recurrent, unannounced, and unjustified "breaks" (where he admittedly was feeding his addiction) led to his **dismissal** **after** **just** **eight** **months**.

276.    Chismire's prior record, his resumption of similar activity, and the numerous reports from other nurses presented red flags to each defendant-manager of imminent harm to HVHS patients.

277.    Yet, over eight years of such behaviors, HVHS has done nothing; rather, HVHS has enabled Chismire's crimes and put HVHS patients at risk, leading to at least four unreported Sentinel Events since the Fall of 2023—with three in 2024 alone.

278.    Since 2021, Duckett has regularly reported Chismire's drug diversion and suspicious behaviors to her nursing supervisors on shift (typically Ring), reporting that Chismire has gone missing and that Chismire appeared to be working under the influence of drugs when he returned from his so-called breaks.

43

279.    Ring became angry with Duckett for reporting Chismire's absences and behaviors and did nothing to follow HVHS policies or federal law relating to known or suspected drug diversion.

280.    Duckett has observed Chismire return from the extended breaks so sweaty that his hair is wet, with his shirt untucked and eyes glazed over.

281.    Duckett has also observed Chismire rubbing Vaseline on his legs during his shifts.

282.    When she asked Chismire why he was rubbing Vaseline on himself, he was unable to form a coherent answer.

283.    Relators have noticed Chismire slurring his speech during his shifts.

284.    Relators have seen Chismire walk and move unusually slowly during his shifts.

285.    Relators have seen Chismire type incoherent notes into patient charts during his shifts.

286.    Chismire left the hospital one night at 7:00 PM after being observed with numerous apparent indications of drug usage, so Duckett and the nurse in charge that day, Nicole Traupman, called the Sewickley Police to report that Chismire was driving while high.

287.    On another occasion, Relators and other female nurses approached a male physician, Dr. Kendall Shaw, to ask for assistance reporting and removing Chismire from the ED working floor because they were afraid that he would react and become violent because he was extremely high at the time.

288.    Dr. Shaw stated that he would assist Relators, but Homyk again told them to "stand down."

289.    On yet another occasion, the Relators and other female nurses asked Dr. Shaw for help in removing Chismire from the ED floor if he became violent later in the night as a result of diverting controlled substances during his shift.

290.    Once again, Homyk interfered to the benefit of Chismire and to the detriment of patients, nurses, doctors, and the general public by blocking any confrontation with or drug-testing of Chismire while he was observed missing time, dropping assignments, and apparently under the influence.

291.    Other red flags known to HVHS nursing supervisors have existed for years.

292.    At all times relevant, Chismire locked his locker in the nurses' locker room with a bolt lock.

293.    Chismire locks his locker to this day.

294.    Most other nurses do not lock their lockers in the nurses' locker room.

295.    As recently as April 15, 2025—when two vials of Valium went missing—Gallo directly observed and photographed Chismire's locked locker, suggesting that Chismire stores evidence of his crimes in that locker and is aware that he must only access it when he is alone.

296.    Upon information and belief, diverted drugs and drug paraphernalia are stashed in Chismire's locked locker and in Chismire's locked truck in the HVHS basement parking area.

297.    Upon information and belief, Chismire takes drugs in the locker room during his shifts.

298.    Duckett has seen Chismire park in the basement parking area of HVHS.

299.    The basement parking area is further from the ED than the normal nurses' parking area.

300.    The basement parking area does not have security cameras.

45

301.    Duckett has observed Chismire sitting in his truck in the basement parking area for extended periods while he is supposed to be seeing his assigned patients.

302.    Upon information and belief, Chismire now takes drugs in his truck during his shifts because, as alleged herein below, in 2023 he was discovered with an orange tourniquet and syringes in the nurses' locker room bathroom and is now taking steps to evade detection by taking controlled substances in his truck during his unannounced, unapproved, and extended ¨breaks.¨

303.    Upon information and belief, Chismire has diverted controlled substances from HVHS-Sewickley that were intended for government-insured patients and that inflated HVHS government-reimbursement costs. The controlled substances diverted include but are not limited to morphine, buprenorphine (alone or as part of Suboxone), diazepam (Valium), lorazepam (Ativan), and oxycodone.

### Homyk Covers Up Real-Time Evidence of a Contemporaneously Documented and Reported Drug Diversion

304.    Relators have reported to HVHS nursing managers finding Chismire's drug paraphernalia—*including tourniquets and used Valium syringes*—in the bathroom trash can located in the nurses' locker room.

305.    In particular, on December 7, 2023, registered nurses Matt Jennings and Olivia Drumm took photographs of the drug paraphernalia in the trash can in the nurses' locker room bathroom immediately after Chismire vacated the room.

306.    Given the years-long failures of Mitry, Homyk, Pietropaolo, Leckey, and Boyd to take any steps to test, discipline, stop, or terminate Chismire, the ED nurses decided on December 7, 2023 to document with pictures direct evidence of Chismire's misconduct.

307.    The ED nurses on shift with Chismire that day all knew that the day before, December 6, 2023, Chismire had improperly diverted to himself 10 vials of Valium.  Ten vials of Valium contain 100 milligrams of this powerful drug, enough to tranquilize an elephant.

308.    Accordingly, the nurses expected that Chismire would shoot up intravenously one or more of the missing Valium vials on his shift and be high at work on December 7—given his deep addiction and ingrained conviction that he could get away with anything at HVHS after six years of doing so under Homyk's protective watch.

309.    In short, the nurses devised their own sting.

310.    As anticipated and observed by numerous ED nurses, Chismire was plainly high on his shift and nearly unable to walk at times.

311.    HVHS has two staff bathrooms near the nurses' station in the Sewickley ED typically used by the staff.  There are also two patient bathrooms available for the patients near the ED nurses' station – so there are four bathrooms readily available for use in proximity to the nursing staff.

312.    At one point, Jennings saw Chismire wobbling down the long hallway away from the main nursing area toward the nurses' locker room where Chismire maintained his bolt-locked locker.  There is a bathroom in the nurses' locker room.

313.    By the time Jennings arrived in the locker room, Chismire had already entered and gone into the staff bathroom and locked the door behind him.

314.    Jennings waited for Chismire to come out of the bathroom and leave the locker room and then immediately entered the bathroom.

315.    Jennings found a freshly-used orange tourniquet and empty Valium syringes in the trash.

47

316.   The nurses' locker room is only accessible to nurses, who must swipe their badge to gain access to the room just before entering.  Thus, upon information and belief, HVHS card swipe data will show that Chismire was the only one in the nurses' locker room bathroom at this time before Jennings followed him.

317.   Jennings immediately took photographs of the trash can containing the orange tourniquet and empty syringes to document the scene he had found after Chismire had used the room.

318.   Within minutes of taking the incriminating photographs, Jennings, per HVHS CS and MEM Policies, shared them with the nurse supervisor for the day, Lyndsey Bober, R.N.  Ms. Bober is the sister of John Bober, who is also an R.N. and Homyk's son-in-law.

319.   Bober immediately thereafter met in person with Homyk per CS and MEM policies, showed Homyk the photographs, and also provided Homyk with pharmacy records showing Chismire's unauthorized withdrawal of controlled substances in recent days with no matching orders from physicians.

320.   In open and staggering defiance of HVHS policies and relevant laws, Homyk told Bober to "back down" and that she was interfering with the investigation of Chismire.  Bober left stunned and returned to the ED crying.  Homyk did nothing.

321.   Given Homyk's active cover-up and brazen disregard for patient safety, on the very same day, December 7, 2023, Duckett twice called and left messages for Vice President and Chief Human Resources Officer, Laurie Clemens, to report finding Chismire's drug paraphernalia in the trash.  Duckett also sent an e-mail to Clemens on December 8, 2023 to report this incident.

322.   Clemens never responded to Duckett's outreach.  Neither Clemens, Homyk, Mitry, nor any other HVHS defendant-manager did anything.

323.    Predictably, Chismire's drug diversion continued unabated.

**Chismire's Behavior Bespeaks of a Junkie Nurse—and HVHS Defendants
Enable His Criminal Behavior By Allowing It To Proceed Without Repercussion**

324.    On April 24, 2024, Gallo saw Chismire leading a new hire, Heather McKenna, R.N., through orientation in the ED.

325.    Gallo asked another colleague, Christy Fowler, R.N., how it was possible that Chismire was still employed at HVHS-Sewickley and orienting new nurses who were not familiar with his drug-diversion history.

326.    Gallo advised Fowler of the obvious and improper motivation behind Chismire's targeting of new nurses, *i.e.*, Chismire intended to enhance his odds of undetected drug diversion via improper "wasting" by exploiting nurses still unfamiliar with HVHS polices and Chismire's active addiction.

327.    Fowler responded that Chismire's drug abuse was widely known in the ED and that there had been multiple reports to supervisors in the five years Fowler had worked there, but nothing came of them.

328.    Chismire repeatedly made mistakes when diverting drugs via improper "wasting" that would have made apprehension a simple matter for the defendant-managers if they had any genuine concern about patient safety and following the HVHS policies designed to promote such patient safety.

329.    A new nurse, Matt Strati, started working in the ED in 2021.

330.    In keeping with Chismire's predatory and duplicitous behavior, he asked Strati to waste Ativan.

331.    When Strati arrived at the medication room, Chismire was already inside and visible to Strati through a window in the medication room door.

49

332.    Strati saw Chismire injecting normal saline (medical water) into an already-emptied Ativan vial.

333.    Normal saline looks exactly like Ativan does in a vial.

334.    Chismire intended to make it appear to Strati as if all the medication was still intact and that nothing was yet given to the patient.  Chismire wanted to make it appear that the medication was taken out of the medication drawer in excess by pure accident and that it needed to be returned or wasted.

335.    In a case where the Ativan vial was already drained and replaced with saline, no actual medication would be given to the patient (and no actual medication would be wasted in the proper manner), as the real medication was already diverted entirely to Chismire.

336.    Chismire did not know Strati watched this illegal and improper act.

337.    Strati knew Chismire's concocted scenario was false.

338.    Strati understood the gravity of Chismire's behavior and refused to waste or return adulterated drugs with Chismire.

339.    Strati has since left HVHS.

340.    Upon information and belief, numerous additional "wastes" were conducted by Chismire using similar means, often using false records and/or new nurses to conceal his thefts of controlled substances and saline replacements.

341.    Upon information and belief, Chismire and other HVHS Defendants would alter records or undertake other efforts to conceal or misuse credentials when such improper "wastes" were refused by more experienced nurses (such as both Relators) that nonetheless still resulted in drug diversion by Chismire.

342.    Fully aware of Chismire's blatant and out-of-control drug diversions, Pietropaolo improperly allowed Chismire to orient new nurses in violation of HVHS policies and at the constant risk of patient safety.

343.    In light of her managers' total disregard of Chismire's addiction and its fall-out, on April 24, 2024, Gallo submitted a written report to the Pennsylvania Department of State Bureau of Enforcement and Investigation (the "BEI"), which oversees complaints against licensed nurses (and numerous other state licensees of all types).

344.    Upon information and belief, either Homyk or another nurse named John Bober (Homyk's son-in-law and Chismire's close friend), or both, tipped off Chismire that the BEI was investigating him.

345.    Soon thereafter, Chismire shaved his head and facial hair.

346.    Chismire shaved his hair to avoid being caught by a drug test because hair samples can be used to trace drug usage over a longer period than urine and blood samples (a fact well-known to Chismire as a nurse and admitted drug addict).

347.    Chismire's abrupt shaving of hair provided a major, unheeded, and uninvestigated red flag for Homyk.

348.    Homyk knew that Chismire understood the significance of hair analysis in detecting the presence of controlled substances because Chismire had agreed to submit to such testing under the Probation Order.

349.    Likewise, since this tip-off from Homyk and/or John Bober, Chismire began to park his truck at the far end of the lot and use that truck as a location of choice for his drug usage at work.

350.    On September 12, 2024, a professional conduct investigator from the BEI, Shannon Landis ("Landis"), e-mailed Gallo and asked to meet with her to discuss both Chismire and Homyk.

351.    Gallo and Landis met in person in September 2024, and Landis stated that the BEI had received other anonymous complaints about Chismire beyond those from Gallo.

352.    Notwithstanding Homyk's blatant disregard of relevant policies and law, Gallo had the courage to confront Homyk in 2025 and ask for an explanation for her illegal and improper conduct.  This was not an easy task.

353.    Gallo initially called Homyk without response, and then went to her office to no avail.

354.    Gallo heard nothing from Homyk until January 13, 2025.

355.    That day, Homyk came to the ED, pulled Gallo into a break room, and closed the door.

356.    Homyk asked Gallo what she wanted.  Gallo requested an update on the status of the investigation into Chismire's misconduct and whether Homyk had presented her evidence of Chismire's drug diversion to the BEI.

357.    In meeting with Homyk, Gallo also expressed her concern that the Chief Nursing Officer's failure to address Chismire's conduct was putting all the ED nurses' licenses at risk.  Gallo also questioned why some nurses had been subjected to drug tests, but not Chismire.

358.    Homyk did not address Chismire's ongoing criminal conduct or offer any plausible explanation why he was consistently able to avoid drug testing, but defiantly told Gallo that the young nurse could think whatever she wanted about Homyk's management.  Even when squarely on notice and confronted, Homyk did nothing to legitimately address Gallo's concerns.

359. Gallo found this response deplorable, yet consistent with Homyk's cover-up and her unconscionable failure to protect the nursing staff and HVHS-Sewickley ED patients.

360. Ultimately, on February 19, 2025, the BEI advised Gallo that it would not prosecute Homyk or Chismire and it was closing the case.

361. Upon information and belief, the BEI did not interview Bober, Jennings, Drumm, Fowler, or any other ED nurse or doctor.

362. Rather, upon information and belief, BEI conferred only with Homyk, who continued her cover-up in violation of HVHS policies and state perjury laws related to making false statements to government investigators.

363. Homyk and Pietropaolo have told the other nursing managers that "Chismire would have to overdose in the bathroom" before they would subject him to a fit-for-duty drug test and place him into rehab.

364. That illegal and grossly negligent decision led to four (4) unreported Sentinel Events in the HVHS-Sewickley ED, three in 2024 alone.

365. HVHS also has a Sentinel Events policy. *See* Exhibit 9, HVHS Sentinel Events Policy.

366. A Sentinel Event, as defined by The Joint Commission for hospital accreditation, "is a patient safety event (not primarily related to the natural course of the patient's illness or underlying condition) that reaches a patient and results in any of the following: death, permanent harm, [and/or] severe temporary harm." *Id.* at 1.

367. HVHS's Sentinel Event policy requires that a "thorough Root Cause Analysis and action plan will be prepared within 45 calendar days of the event or HVHS becoming aware of an event." *Id.* at 2.

**Unreported Sentinel Event 1:  Chismire's Addiction and Impaired Judgment Nearly Kills an African-American Male With Severe Hand Lacerations in Fall 2023**

368.    One day in the fall of 2023, Nursing Supervisor Pietropaolo had assigned Chismire to the triage station in the ED.

369.    Pietropaolo placed Chismire there to keep him away from ready access to the controlled substances room.

370.    Shortly after noon that day, an African-American male presented with severely cut hands from a machete incident, bleeding profusely (the "Laceration Patient").

371.    When working triage, an R.N., such as Chismire, must evaluate and prioritize care of ED patients based on the severity of their injuries or illnesses and their likelihood of survival without immediate trauma care.

372.    Proper triage procedures ensure that the most critical patients receive medical attention first.

373.    Notwithstanding the obvious, profuse bleeding of the Laceration Patient, an already-impaired Chismire put the patient back in the patient waiting room unattended for two hours.

374.    At a shift change at 3 p.m., R.N. Kayla Meyers arrived to see to her horror the Laceration Patient in the patient waiting room, now drowsy and lightheaded.

375.    Meyers immediately took the Laceration Patient to a trauma room and checked his vital signs, finding his blood pressure had dropped to the low 60s and his heart rate had dropped to the low 50s, *i.e.*, life-threatening readings.

376.    The Laceration Patient had lost so much blood while sitting in the waiting room that he was spiraling into shock, becoming lethargic and unresponsive.

377.   Meyers demanded of Pietropaolo why Chismire had placed the Laceration Patient in the waiting room for two hours rather than providing immediate emergency care pursuant to appropriate triage procedures.

378.   Pietropaolo simply shook her head and said she had to keep Chismire in sight and away from the controlled substances room.

379.   Chismire had also grossly and wantonly failed in his duties by not immediately notifying a physician of the Laceration Patient's life-threatening condition and exigent needs.

380.   Thus, Meyers contacted a physician assistant, Tess Kolarick, who immediately attended to the Laceration Patient, instantly assessed he might die because of Chismire's gross negligence, and made a panicked call for an ambulance to transport the Laceration Patient to Allegheny General Hospital to try to save his life.

381.   HVHS and the defendant-managers, by allowing Chismire to work in the ED, threatened patient safety on a daily basis.

382.   HVHS and the defendant-managers, on a daily basis, violated the Pennsylvania Professional Nursing Law, which prohibits a hospital or its managers from allowing a nurse to practice if there is probable cause to believe that nurse is unable to provide nursing with reasonable skill and safety to patients by reason of mental or physical illness or psychological dependence on hallucinogenic, narcotic, or other drugs that impair judgment and coordination.

383.   Chismire's impairment and utter lack of judgment, combined with Pietropaolo's deliberate disregard for proper nursing procedures, nearly cost the Laceration Patient his life and reflected blatant violations of relevant state nursing law.

**Unreported Sentinel Event 2: Chismire's Unaddressed Drug Addiction and Resultant Substandard Care in Spring 2024 Results in a Preventable Death**

384.    In Spring 2024, an elderly female patient presented to the triage nurse at HVHS-Sewickley with her daughter.

385.    The triage nurse on duty was Renee Michaelson, R.N.

386.    The supervising physician on duty was Dr. Boyd.

387.    Dr. Boyd quickly recognized the patient's condition as non-life-threatening and prescribed a medication that would help alleviate the condition and allow the patient to leave in short order.

388.    Chismire was assigned to take care of the elderly female patient, but Chismire did not go into the patient's room for at least ninety minutes. Even at HVHS, ED nurses try to visit a patient's room within five to ten minutes of a patient's arrival there.

389.    The patient's daughter grew frustrated and reported that no nurse had come to the room to provide the medication ordered by Dr. Boyd. Likewise, the patient had no IV, and no laboratory blood studies were administered.

390.    Chismire could not be located for at least another hour, and remaining available nursing staff could not assist because they had to attend to higher-need patients.

391.    When Chismire finally returned from his unannounced and unjustified break two-and-a half hours later, upon information and belief, he was working under the influence of drugs he had stolen.

392.    Upon information and belief, Chismire made a medication error when filling the order from Dr. Boyd for the elderly patient.

393.    As a result of the medication error, the patient's condition worsened to a code, *i.e.*, a life-threatening emergency.

394.    Dr. Boyd, the attending physician, screamed, "This patient should not be dying!"

395.    Within three hours of her admission, the patient was dead.

396.    Upon information and belief, the patient's daughter reported Chismire to HVHS-Sewickley.

397.    The grossly substandard "care" of this elderly female patient represented a Sentinel Event resulting in death.

398.    Upon information and belief, Medicare was nonetheless billed for the full cost of this patient's treatment and medication as if it had all gone well and been provided in accordance with professional standards.

399.    Neither HVHS nor any of its defendant-managers reported Chismire's diversion/impairment or prepared and submitted a DEA 106 Form.

400.    Neither HVHS nor any of its defendant-managers did a Root Cause Analysis as required by the Sentinel Event policy.  HVHS knew the "root cause"—his name is Nolan Chismire.

401.    Neither HVHS nor any of its defendant-managers tested, disciplined, or otherwise made any inquiry whatsoever concerning Chismire.

402.    Neither HVHS nor any of its defendant-managers questioned Chismire about his two-and-a-half-hour absence from the ED floor.

403.    Neither HVHS nor any of its defendant-managers demanded access to Chismire's bolt-locked locker in the nurses' locker room—nor did they ever independently seek to open the locker, which is HVHS property, not Chismire's.

404.    Further, neither HVHS nor any of the defendant-managers took necessary steps under the HVHS Event Reporting Policy.

405.    The Event Reporting Policy requires that, if any HVHS employee witnesses an event inconsistent with the "routine operation" of the hospital, he or she shall document and report the event for integration into the HVHS quality management and patient safety functions for systematic review.  *See* Exhibit 1.

406.    The Event Reporting Policy advises that immediate documentation "of the details" of the event provides "a means for investigation of causes to assure appropriate corrective intervention occurs." *Id.* at 1.

407.    Not only did no investigation of Chismire occur, but also—shortly after this incident—Homyk lied to BEI investigators inquiring about multiple complaints concerning Chismire's care.  Rather than confirming, as she initially did to Gallo, that Homyk had evidence that could and should result in discipline and/or dismissal for Chismire, Homyk covered up his criminal acts and grossly substandard care.

408.    The HVHS Event Report Policy also defines a "Serious Event" as involving clinical care that results in an "unanticipated injury" or "death." *Id.* at 2.  The stunning fate of this elderly female patient, about whom Dr. Boyd cried out, "This patient should not be dying!" plainly qualifies as a Serious Event under HVHS policies.

409.    Accordingly, HVHS had a duty pursuant to the Event Report Policy and relevant law to report this incident to the deceased's family and the Joint Commission as a Serious Event inconsistent with the proper operation of an ED.

410.    Upon information and belief, neither HVHS nor any of the defendant-managers reported this death to the deceased's family or the Joint Commission as a Serious Event.

411.    HVHS and its defendant-managers are aware that such reports are investigated, typically result in costly investigations, and allow for substantial clawbacks of Government payments and related monetary relief.

412.    Once again, HVHS and its defendant-managers covered up Chismire's criminal conduct and grossly substandard medical "care."

**Unreported Sentinel Event 3:  Chismire's Illegal Conduct Resulted in an Unreported Sentinel Event in 2024 Involving a 47-Year-Old Alcohol Withdrawal Patient**

413.    In late October or early November 2024, while Chismire was working, a nursing supervisor assigned to his care a forty-seven-year-old alcoholic patient experiencing symptoms of alcohol withdrawal.

414.    Chismire did not provide the patient with any care whatsoever.

415.    The patient became agitated and threatened to leave the ED if no one treated his withdrawal symptoms.

416.    Other nurses exhorted Chismire to do something for the patient's withdrawal, but Chismire continued to deny care.  Chismire said:  "I don't give a shit if this guy wants to sign out and leave the ED."

417.    In the absence of care from Chismire, the patient left the hospital against medical advice.

418.    Minutes later, a hospital visitor found the forty-seven-year-old patient in the HVHS-Sewickley parking lot bleeding from his head.

419.    The patient was on the ground and unresponsive.

420.    The patient had sustained a subdural hematoma.

421.    The Charge Nurse (Defendant Ring), a security guard named Greg, and a concierge employee dragged the bloody patient through the hospital to the ED from the parking lot.

422.    The patient was transferred to Allegheny General Hospital.

423.    Upon information and belief, the patient died.

424.    Ring reported this incident to Homyk that day and further advised that Chismire was the nurse in charge of this patient.  Homyk did nothing.

425.    As his peers had repeatedly warned Homyk, Ring, Pietropaolo, and the other defendants, Chismire's drug diversion and gross negligence had directly resulted in a Sentinel Event with respect to the 47-year-old patient.

426.    HVHS did not do a root cause investigation.

427.    HVHS did not drug-test Chismire.

428.    HVHS did not discipline or terminate Chismire.

429.    Chismire continued to careen through the ED, and—a month or so later—caused a third Sentinel Event in 2024 alone.

**Unreported Sentinel Event 4:  In 2024, Chismire Diverted Morphine From A Patient With Severe Pain**

430.    In December 2024, a patient arrived at the ED with severe pain (the ¨Pain Patient¨).

431.    The room had not yet been assigned by a nursing supervisor, so Chismire signed himself up to care for the Pain Patient in that room.

432.    No wonder; a physician had written a prescription order for the Pain Patient for four milligrams of morphine for the patient's pain.  Since 2009, morphine has been one of Chismire's narcotics of choice.

433.    At the nursing shift change, a new nurse named Autumn Trempus relieved Chismire.

434.    The Pain Patient immediately complained to Trempus that the Pain Patient never got any pain relief from the "medication" allegedly supplied by Chismire and questioned whether

Chismire actually gave her any morphine. The Pain Patient's question did not arise from panic or pain, but informed reason, *i.e.*, she had received morphine before and knew what it would feel like to receive it.

435. Upon information and belief, Chismire diverted the morphine that was meant for the Pain Patient.

436. Trempus reported this irregularity to Duckett and asked her what to do. Duckett advised Trempus to report the missing morphine to their supervisor, Ring, which Trempus did.

437. HVHS acknowledges in its CS Policy that it must comply with all federal and state laws governing the handling of controlled substances—and claims it enforces such laws within its facilities.

438. Chismire's conduct with the Pain Patient reflected an obvious "drug misadventuring" under the MEM Policy and a "discrepancy in the handling of controlled substances" under the CS Policy. *See* Exs. 7, 8.

439. Accordingly, pursuant to its own policies and federal law, HVHS had a legal duty to prepare a DEA Form 106 to report a "known or suspected theft of a controlled substance," *i.e.*, morphine, which Chismire stole from the Pain Patient to feed his addiction.

440. As HVHS knew or should have known from a review of Chismire's Probation Order and related Board of Nursing records, Chismire admitted that, thirteen years before, in 2011 during his five-week stint at AGH, he diverted morphine for his personal use, along with Ativan and fentanyl. HVHS also had numerous internal reports from nurses and internal audits that repeatedly showed much more recent, large-scale, and frequent drug diversion by Chismire (including morphine). In other words, HVHS knew that Chismire used morphine as a narcotic of choice to feed his addiction.

441.    Neither HVHS nor any of the defendants prepared and submitted a DEA Form 106.

442.    The nursing managers have grown numb to Chismire's criminal conduct and illegally accept it as the norm at HVHS, enabling a pervasive and constant threat of harm to HVHS-Sewickley ED patients.

443.    HVHS and all defendants concealed Chismire's criminal conduct with respect to the Pain Patient per that illegal, but institutional, norm.

444.    The failure of HVHS and the defendant-managers to terminate Chismire for his repeated drug diversions over multiple years finally resulted in wholly predictable catastrophic deaths and injuries in 2024.

### HVHS's Knowledge and Awareness of Chismire's Illegal Conduct

445.    As set forth above, Relators became aware of Chismire's misconduct as soon as they were assigned shifts with him, due to his outward physical symptoms of being high, which they easily observed as nurses working about four feet away from him for substantial portions of a twelve-hour shift.

446.    Relator Gallo reported Chismire's improper controlled substance handling (the second Valium waste described above) to Ring and Pietropaolo.  Ring reported it to Homyk, who told Gallo not to tell anyone what she had seen Chismire do with the Valium.

447.    Relator Duckett also reported Chismire's improper controlled substance handling to Ring, specifically the Suboxone waste, but Ring took no action.

448.    Duckett has also reported Chismire to HVHS's Human Resources staff on numerous occasions, to no avail.

449.    Relators also told ED Drs. Boyd and Leckey about Chismire's misconduct, but the physicians have refused to take action.

62

450.    Each time Relators' reports of Chismire's misconduct reached Homyk, she told Relators to "stand down."

451.    In December 2024, Gallo e-mailed Homyk to ask what the CNO was doing to address Chismire's misconduct—Homyk did nothing.

452.    The specific instances and observations noted above are merely examples of directly observed misconduct.

453.    Upon information and belief, a review of Chismire's patient files over the past eight years (or a statistically valid random sampling thereof) will reveal numerous additional cases where it is clear that drugs were diverted and/or worthless services were rendered.

454.    Upon information and belief, the claims submitted by HVHS that are tainted by HVHS's false certifications of CSA compliance, Chismire's diversion of Government-paid medicine intended for Government-insured patients, and Chismire's worthless services are valued in the tens of millions of dollars, given the value of the medications at issue, the number of patients seen at HVHS-Sewickley's ED, and the number of local residents on government-paid health plans.

455.    Experts in both DEA diversion (including former DEA agents) and in CMS billing and coding (including in the hospital-compliance/billing space) have been consulted by Relators' counsel and agree that the facts as alleged demonstrate substantial criminal activity as well as a substantial likelihood of millions of dollars in false claims being submitted, which can be verified with the discovery process and review of files that only HVHS has at this time.

### Not Even Tina Chismire's Acknowledgement of Her Husband's Addiction and Tearful Pleas for Help Have Penetrated the HVHS Cover-Up

456.    Nurses other than Relators have also reported Chismire's behavior to Homyk.

457. One such nurse is Chismire's own wife, Tina Chismire, also an R.N. at the Sewickley-ED, who came in in tears and asked other nurses, including Lindsey Bober, Caron Baker, and Patricia Dobich, to assist her in reporting her husband's misconduct.

458. Upon information and belief, at least six nurses (in addition to the Relators) separately and together made reports to Homyk about Chismire.

459. Homyk did not do anything in response to those reports, in blatant disregard of the CS Policy, MEM Policy, Sentinel Event Policy, Serious Event Policy, and relevant federal and state laws.

460. HVHS and its defendant-managers' conduct also defies well-known healthcare industry standards.

461. In 2019, the Joint Commission's Division of Healthcare Improvement, published a "Drug Diversion and Impaired Health Care Workers" safety alert (the "Drug Diversion Alert"). *See* Exhibit 10, The Joint Commission, Quick Safety Drug Diversion and Impaired Health Care Workers, https://digitalassets.jointcommission.org/api/public/content/f21dcde6feab41efb45f8c03ae2e357f?v=d8f67603 (last visited Jan. 31, 2026).

462. The Joint Commission identified drug diversion as a threat to patient safety, warning that "diversion may cause undue suffering to patients who do not receive analgesic relief, can be costly to an organization by damaging its reputation, and may lead to major civil and criminal monetary penalties." *Id.* at 1.

463. The Drug Diversion Alert said that "about 10 percent of health care workers are abusing drugs," citing statistics from the U.S. Substance Abuse and Mental Health Services Administration and the American Nurses Association. *Id.*

464.    The Drug Diversion Alert also warned:  "Experts believe that only a fraction of those who are diverting drugs are ever caught, despite clear signals - such as abnormal behaviors, altered physical appearance and poor job performance.  **Direct observation is vital to detecting diversion and may be the only way to identify an impaired colleague.**"  *Id.* (emphasis added).

465.    The Drug Diversion Alert also made this essential point:  "**The organization's culture must support empowerment of staff to stop, question and act.**  Health care workers must be empowered to speak up when something seems abnormal or unsafe."  *Id.* (emphasis added).

466.    The Relators and their staff nursing colleagues identified in this Complaint have provided repeated, startling, and damning eyewitness reports to the defendant-managers of Chismire's abnormal behavior, Chismire's altered physical appearance, Chismire's grossly negligent job performance, Chismire's violation of waste procedures, Chismire's diversion of controlled substances, and Chismire's reckless, wanton, and addictive behavior resulting in serious injury and death to HVHS patients—causing at least three Sentinel Events in 2024 alone.

467.    HVHS and its defendant-managers have intentionally and wantonly ignored staff eyewitness reports of a drug addict among them wreaking havoc — notwithstanding the Joint Commission's fundamental exhortation to hospital administrators that "direct observation is vital to detecting diversion and may be the only way to identify an impaired colleague."

468.    The criminal, illegal, and grossly negligent conduct of HVHS and its defendant-managers have caused at least four Sentinel Events in roughly two years, an average of one healthcare tragedy every four to five months.

469.    Why?  Homyk and all the defendant-managers operate under this central, accurate, and numbing fear:  if Chismire is exposed, so are they.

470. If Chismire faces criminal charges, he will implicate them. So, the cover-up continues.

**Defendants' Retaliation Against Relators**

471. Since raising their concerns to Defendants, Relators' actions at work have been under increased scrutiny, including but not limited to their charts being audited more frequently and carefully.

472. Upon information and belief, there is no reason for this increased scrutiny other than to intimidate and silence Relators.

473. For example, in November 2024, Pietropaolo summoned Duckett to her office to admonish Duckett for putting in an order as a protocol for a fecal test for a male patient admitted to the ED complaining of belly pain.

474. It is common—and indeed life-saving—for nurses to put in orders for testing as protocols when a patient is admitted to the ED, so that—when a physician becomes available to see the patient—there is no delay in care. The commonly sought test results are already there.

475. Pietropaolo criticized Duckett for ordering the lab test, claiming it was later determined not to be needed.

476. Duckett explained that she had ordered the fecal lab test as an open order under protocol, but Pietropaolo continued to excoriate her.

477. Duckett requested that Pietropaolo call HR and have the supervising physician, Dr. Leckey, join the meeting as well.

478. Pietropaolo refused to involve HR and backed down, stating she would not write Duckett up for ordering the test.

479.    Upon information and belief, Pietropaolo backed down because she knew she had no legitimate basis for admonishing Duckett.

480.    As the stress of working with an unmanaged and unchecked Chismire mounted, Duckett requested an unpaid leave of absence from her manager, Pietropaolo, three times via e-mail and three times via phone call, in December 2024.

481.    Pietropaolo ignored Duckett's six requests for leave.

482.    Duckett requested the leave of absence from HVHS's Human Resources Department after not receiving any answer from Pietropaolo.

483.    HVHS's Human Resources Department granted Duckett's leave request on or about January 8, 2025.

484.    After receiving approval of the leave via mail and phone call from Ellen Heinlein, Duckett began her approved leave in January 2025.

485.    Pietropaolo contacted Duckett during her leave, accusing her of missing scheduled shifts and threatening to suspend her.

486.    Duckett defended herself by pointing to the leave granted by HR as well as her numerous prior communications with Pietropaolo.

487.    Pietropaolo claimed she did not know that her own direct report, Duckett, was on an approved leave.

488.    On November 6, 2025, Duckett called Clemens to request the end of her approved leave of absence and begin return to work in her position as a staff RN in the HVHS-Sewickley ED.  After not receiving an answer to the call, Duckett e-mailed Clemens.

489.    In the same message to Clemens, Duckett inquired about why the items in her personal staff locker in the nurses' locker room had been removed.

490.    The items that had been removed included:

(a)    Duckett's white Patagonia jacket;

(b)    Two pottery bowls that Duckett made herself and initialed on the bottom;

(c)    $40 in cash;

(d)    A mug; and

(e)    Family photos.

491.    Duckett also asked Clemens why her badge to enter HVHS-Sewickley had been deactivated.

492.    Clemens responded first on November 6, 2025, stating that she would "look into it."

493.    About a week later, Clemens e-mailed Duckett and stated that Human Resources employee Joanne Metzer would contact Duckett within the week regarding Duckett's "situation."

494.    Metzer called Duckett on or about November 18, 2025.  To Duckett's utter surprise, Metzer claimed that Pietropaolo had fired Duckett in March 2025.

495.    **<u>Neither Pietropaolo nor anyone else at HVHS ever told Duckett that she had been fired during her approved leave of absence.</u>**  To date, HVHS has not provided any records, communications, or other documentation supporting the contention that Duckett's position was terminated in March 2025.

496.    In fact, Duckett's position is advertised as open for hire on HVHS's website.

497.    Further, HVHS is supposedly prioritizing addressing provider shortages, as indicated in HVHS-Sewickley's Community Health Needs Assessment 2025 – Implementation Strategy Plan, approved by HVHS's Board of Directors in June 2025.  *See* Exhibit 11 at 2-3.

498.    The items in Duckett's locker were missing because Pietropaolo and Ring were observed by other nurses ransacking Duckett's personal locker.  When asked about the missing items by Metzer, Pietropaolo claimed that the locker contained only "old pens and saline flushes."

499.    Contrary to Pietropaolo's claim, one of the staff members familiar with the Pietropaolo/Ring ransacking of Duckett's locker found one of Duckett's handmade, initialed pottery bowls (that had been in her locker) in a drawer in the ED.  That staff member gave Duckett her bowl back.

500.    Duckett requested her other belongings back multiple times from HVHS HR.  To date, HVHS has not given Duckett her personal property back, nor provided any inventory or explanation.

501.    As recently as February 2026, Duckett has been targeted by intimidating and threatening behavior within HVHS.

502.    In February 2026, at least two other HVHS staffers reported that (after Duckett's most recent contact with HVHS to protest the theft of her items) a staff picture featuring several nurses (including Duckett) was taken down from the wall, Duckett's face was cut out of the picture, the picture was placed back on the wall, and the cut-out of Duckett's face was push-pinned into the wall separately next to the picture.

503.    Upon information and belief, Pietropaolo and Ring conspired to harass and fire Duckett in secrecy and stole or discarded her personal property to ensure she could not and would not want to return from her leave of absence and to prevent her from shining a light on the continuing drug diversion actively harming patients and being covered up by HVHS and the defendant-managers.

504.    Upon information and belief, Pietropaolo threatened to fire—and then purportedly did fire—Duckett during her leave to discourage her from returning or continuing to blow the whistle on Chismire's misconduct and HVHS's complicity and related fraudulent billing.

505.    Upon information and belief, Defendants are attempting to drive Relators to either stop reporting Defendants' criminal/fraudulent conduct or leave employment at HVHS.

506.    HVHS's botched undocumented handling of Duckett's purported termination is representative of its general disregard for the law and its intentional failures to share (or, worse, concoct) information even among its own staff with a need to know.

**THE UNITED STATES HAS BEEN DAMAGED**

507.    As described above, Defendants have profited and the United States has been damaged monetarily by the practices used by Defendants to make false claims to federal healthcare programs for payment and reimbursement.  Defendants have submitted numerous false claims for excessive and unauthorized payments and reimbursements and have obtained excessive compensation from the United States as a result.

**COUNT I**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
*Claims for Medications Not Delivered to Patients*
*Against All Defendants*

508.    Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

509.    This claim is for treble damages, civil penalties, and attorneys' fees under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

510.    By reason of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United

States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would not otherwise have been allowed.

511.    Specifically, Defendants have presented claims for payments for controlled substances, which were diverted.

512.    In effect, the United States paid for undelivered or worthless goods.

513.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

514.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### *Claims for Express False Certifications*
### *Against HVHS*

515.    Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

516.    This claim is for treble damages, civil penalties, and attorneys' fees under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

517.    By reason of the acts described above, HVHS has knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would not otherwise have been allowed.

518.    In presenting claims for payment to the United States for HVHS-Sewickley ED services, HVHS expressly certified on each claim form or invoice that it was in compliance with federal and state laws and regulations and contractual requirements (including without limitation the Controlled Substances Act, patient-safety regulations barring impaired nurses from working,

71

and numerous other laws regarding its maintenance of safe and effective internal compliance procedures).

519.    At the time of presenting these claims for payment, HVHS knew that such representations of full material compliance were false.

520.    HVHS knew it was actively violating the CSA and other federal and state statutes and regulations.

521.    HVHS also knew that the certifications of compliance were material to the United States' decision to pay claims.

522.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

523.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT III**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
*Claims for Implied False Certifications*
*Against All Defendants*

524.    Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

525.    This claim is for treble damages, civil penalties, and attorneys' fees under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

526.    By reason of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would not otherwise have been allowed.

527.    In presenting (or causing to be presented) claims for payment to the United States, Defendants certified (or at least knew that certification would be caused or was implied) that HVHS was in compliance with federal and state laws and regulations and contractual requirements material and necessary for payment under Government healthcare programs.

528.    Each Defendant knew that HVHS was materially and systemically noncompliant with major public-safety and patient-safety regulations governing controlled substances, impaired nurses, and proper emergency-room management.

529.    Each Defendant knew that the Government would expect substantial, material, systemic compliance with controlled-substances controls, patient-safety regulations (including testing and removing impaired nurses), and the other regulations addressed above before paying any part of any claim.

530.    Defendants also knew that the United States relied on HVHS's Joint Commission accreditation to establish that HVHS complied with CMS's Conditions of Participation.

531.    In presenting claims for payment to the United States, Defendants each failed to disclose (or caused the failure to disclose) HVHS's noncompliance with federal and state laws and regulations and contractual requirements, as well as noncompliance with Joint Commission accreditation requirements.

532.    Defendants' omission of the fact that they and HVHS were violating basic controlled-substance handling and nursing-practice laws rendered any representations of compliance misleading.

533.    Defendants knew or should have known that compliance with those laws were material to the United States' decision to pay claims.

73

534.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

535.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT IV
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### *Claims for Worthless Services in Emergency Healthcare Setting*
### *Against All Defendants*

536.    Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

537.    This claim is for treble damages, civil penalties, and attorneys' fees under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

538.    By reason of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would not otherwise have been allowed.

539.    Specifically, Defendants have presented claims for payment for medical care rendered by a nurse who was high on various controlled substances while working.

540.    The claims for payment were for services that were so inept as to provide no value to the United States or its insured participants, indeed actively harming them in many instances.

541.    The claims for payment were for services rendered in violation of the Controlled Substances Act and DEA and other federal and state regulations.

542.    In effect, the United States paid for worthless nursing services.

543.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

74

544.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### COUNT V
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
*Retained Overpayments and Failure to Audit/Return (Reverse False Claims)*
*Against All Defendants*

545.    Relators re-allege and incorporate by reference the allegations contained in preceding paragraphs, as though fully set forth herein.

546.    This claim is for treble damages, civil penalties, and attorneys' fees under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

547.    Through the acts described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. § 3729(a)(l)(G).

548.    An overpayment from a government program received by a provider in excess of the amount that is due and payable, including any payment for services that are not reasonable and necessary in accordance with the Medicare rules, must be promptly returned by the provider.

549.    Even when an overpayment is received through an innocent billing error or through a mistake of the contractor, 42 U.S.C. § 1320a-7k(d)(l) provides that "returning the overpayment . . . is an obligation as defined in 3729(b)(3) of title 31 for purposes of section 3729 of such title."

550.    Defendants are aware that the conduct described herein has resulted in the submission of claims to government healthcare programs for payment to which Defendants are not entitled.  Defendants have knowingly and wrongfully retained such overpayments.

551.    Defendants have made no legitimate effort to stop the misconduct described above or to genuinely investigate or review claims tied to undelivered drugs, worthless services, or false certifications (whether express or implied).

552.    Indeed, Defendants have actively suppressed efforts to report and remediate the misconduct (including ignoring internal-audit results of pharmacy shortfalls and retaliating against whistleblowers) to keep their ill-gotten gains derived directly or indirectly from unwarranted Government payments to HVHS.

553.    On and after May 24, 2010, the effective day of the legislation that established subsection 7k(d)(l) referred to above, each day that Defendants have retained such an overpayment is a separate violation of the FCA.

<u>COUNT VI</u>
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
*Whistleblower Retaliation*
*Against All Defendants*

554.    Relators re-allege and incorporate by reference the allegations contained in preceding paragraphs, as though fully set forth herein.

555.    Each of the acts of Defendant HVHS and each supervisory defendant, in discriminating against Relators by wrongfully ignoring Duckett's leave request, subjecting Duckett to verbal abuse throughout her four years of employment, targeting both Relators' charts for extra scrutiny, firing Duckett during her approved leave of absence without even informing her, and discarding her personal belongings, violates the provisions of 31 U.S.C. § 3730(h) prohibiting discrimination against employees who investigate and/or report violations of the False Claims Act.

556.    As a direct and proximate result of the foregoing, Relators have lost job security, together with all future benefits appurtenant to their positions with Defendant HVHS. In addition,

76

Relators have sustained damage to their reputations and suffered severe physical and emotional distress. Relators are entitled to all relief necessary to make them whole, including compensation for special damages and all litigation costs and attorneys' fees.

WHEREFORE, Relators, Jennifer Duckett and Samantha Gallo, respectfully request this Honorable Court to enter judgment against Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides;

(b)    Civil penalties against the Defendants equal to $11,000 (to be adjusted for inflation and interest) for each violation of 31 U.S.C. § 3729;

(c)    *Qui tam* Relators/Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d)    *Qui tam* Relators/Plaintiffs be awarded all costs and expenses of this litigation, including attorney's fees and costs of court;

(e)    *Qui tam* Relators/Plaintiffs be awarded all other allowable damages; and

(f)    All other relief on behalf of the Relators/Plaintiffs or the United States Government to which they may be entitled and that the Court deems just and proper (including without limitation the appointment of an independent monitor to oversee HVHS's drug and billing management, discipline supervisory Defendants, and implement substantial corrective action required to investigate, assess, and refund all overpaid claims).

MOREOVER, Jennifer Duckett and Samantha Gallo, on their own behalf, demand and pray that an award be made in their favor for an amount necessary to make Relators whole, including without limitation compensation for deteriorating physical health, mental anguish, suffering, humiliation, pain, discomfort, anxiety, and emotional distress.

## **DEMAND FOR JURY TRIAL**

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

Dated:  February 27, 2026

/s/ Joseph A. Valenti
Joseph A. Valenti (PA 306788)
joe.valenti@saul.com
T. Patrick Martin (PA 338716)
patrick.martin@saul.com
Charles Kelly (PA 51942)
charles.kelly@saul.com
Sophia Sulzer (PA 333681)
sophia.sulzer@saul.com
SAUL EWING LLP
One PPG Place, 30th Floor
Pittsburgh, PA  15222
Tel.:  (412) 209-2500
*Counsel for Relators Jennifer Duckett and Samantha Gallo*