**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,
*ex rel.* JENNIFER DUCKETT
and SAMANTHA GALLO,

Civil Action No. 2:25-cv-527

Relators/Plaintiffs,

v.

HERITAGE VALLEY HEALTH SYSTEMS, INC.,
NOLAN CHISMIRE,
LINDA HOMYK,
RONALD LECKEY,
MICHAEL BOYD,
NORMAN MITRY,
ERIN ADAIR PIETROPAOLO, and
JENNIFER RING,

Defendants.

**RELATORS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY**

Relators Jennifer Duckett and Samantha Gallo, through their undersigned counsel, file this Brief in Opposition to Defendants' Motion to Disqualify Attorney Charles Kelly and Law Firm Saul Ewing LLP (Dkt. No. 44 (the "Motion")) and respectfully request that this Court deny the Motion with prejudice. Defendants' arguments are predicated on the assertion that Kelly had an implied attorney-client relationship with or an ongoing fiduciary duty to Heritage Valley Health Systems, Inc. ("HVHS"). Defendants' arguments fail because HVHS has never been an express or implied client of Kelly or Saul Ewing LLP (the "Firm")—and documents and testimony show that HVHS and its directors knew it. Kelly did not become HVHS's lawyer merely by serving on HVHS's Board of Directors (the "Board"), particularly where HVHS had both inside and outside counsel at all times. With no attorney-client relationship between HVHS and Kelly, HVHS is not a former client. As HVHS's own Board Members attest, Kelly (and other Board Members) never

received any information about the allegations in this case while serving on the Board—so no ongoing director/fiduciary duty regarding prior substantially-related confidences applies. No conflict of interest exists to preclude Kelly or the Firm's representation of Relators.

Even if HVHS had ever been a client, Kelly's alleged "representation" of HVHS was not substantially related to anything in the instant *qui tam* suit. Likewise, even had the issues in this case been raised to the HVHS Board, ongoing fraud against the United States Government by a mandatory-reporter/contractor and public-safety concerns implicating HVHS's charitable mission would permit disclosure and other efforts by Board Members to stop the fraudulent practices. Finally, countervailing policy concerns—most notably Relators' interest in proceeding with their original chosen counsel and not allowing disqualification to be abused as a litigation tactic—suggest that Defendants' motion to disqualify Kelly and the Firm as counsel should be denied with prejudice.

The instant lawsuit, as alleged in the Amended Complaint, is brought under the False Claims Act and alleges that Defendants HVHS and individual corporate executives, doctors, and supervisors allowed an Emergency Department ("ED") nurse to divert and abuse controlled substances, harming patients and the United States Government. (Am. Compl., Dkt. No. 19, ¶¶ 1, 2.) As alleged in the Amended Complaint, Defendant Nolan Chismire stole controlled substances from HVHS for years. (*Id.* ¶ 3.) He was frequently high while on shift—and patients have **died** because of it. (*Id.* ¶¶ 5, 6.) While Defendants have known about Chismire's dangerous behavior for at least **eight years** and have done nothing about it, Defendants' Motion offers no evidence of any kind that Kelly advised on this behavior or was even informed in any way of this behavior before his Board service ended. (*Id.* at ¶¶ 10, 12, 13.)

***HVHS is a sophisticated business entity that does not rely on "implied" attorney relationships.***

HVHS was a Pennsylvania not-for-profit corporation that ran three hospitals and dozens of clinical locations in southwestern Pennsylvania. (Dkt. No. 19, ¶ 24.)[1] By his own admission, Norman Mitry has been HVHS's CEO "for over twenty-five years" and has multiple post-graduate degrees. (Decl. of N. Mitry, ("Mitry Decl.") Dkt. No. 44-1, ¶¶ 4-5.) Given his extensive education and experience, he is "familiar with the functions [and] responsibilities . . . of the HVHS Board of Directors." (*Id.* at ¶ 5.) He also understands how to engage and manage legal counsel, given that HVHS has had attorney-client relationships with at least three different large law firms during his tenure as CEO. (Exhibit 1, Suzanne Paone Affidavit ¶¶ 17-18 ("Paone Aff."); Exhibit 2, Ann Marie Evans Affidavit ¶¶ 11-12 ("Evans Aff."); Exhibit 3, Dr. Karen Jerome-Zapadka Aff. ¶ 11 ("Jerome-Zapadka Affidavit"); Exhibit 5, Charles Kelly Affidavit ¶ 92 ("Kelly Aff.").)

***HVHS never had a written, oral, or implied agreement with Kelly or the Firm to provide legal services to HVHS or any of its personnel.***

As sworn by former Board Vice-Chair Suzanne Paone, former Board Member Ann Marie Evans, and former Board Member Dr. Karen Jerome-Zapadka, HVHS never requested that Kelly represent it in a legal matter. (Paone Aff. ¶¶ 9-11; Evans Aff. ¶¶ 8, 9; Jerome-Zapadka Aff. ¶ 14.) Kelly never agreed to represent or represented HVHS in his capacity as an attorney. (Kelly Aff. ¶¶ 11; Paone Aff. ¶¶ 9, 11.)

---

[1] On June 30, 2026, HVHS and Allegheny Health Network ("AHN") finalized an affiliation agreement that brought "two Heritage Valley hospitals, dozens of clinical locations, and hundreds of physicians into an expansive western Pennsylvania-based network." Press Release, AHN, Heritage Valley Health System Enters New Era as Part of Allegheny Health Network (July 1, 2026), https://www.ahn.org/newsroom/press-releases/press-release.html?pr=heritage-valley-health-system-enters-new-era-as-part-of-allegheny-health-network. *See also* Motion, Dkt. No. 44, p. 3, Mitry Decl. ¶ 3.

At all times Kelly served on the Board, HVHS had outside corporate counsel—typically Thomas E. Boyle, Esq. of Buchanan, Ingersoll & Rooney, PC ("Buchanan"). (Paone Aff. ¶ 17; Evans Aff. ¶ 10; Jerome-Zapadka Aff. ¶¶ 11-13.) In February 2024, Jan Wenzel, Esq. of Buchanan succeeded Boyle as HVHS's outside corporate counsel. (Paone Aff. ¶ 17.) Buchanan was present at all Retreats and Board Meetings where HVHS's legal, transactional, and compliance matters were discussed. (Paone Aff. ¶ 19; Evans Aff, ¶ 13; Jerome-Zapadka Aff. ¶ 12.) Further, during the relevant time period, Sharon Loftus, Esq. was HVHS's in-house general counsel. (Paone Aff. ¶ 18; Evans Aff. ¶ 12; Jerome-Zapadka Aff. ¶ 11.) HVHS also retained John Callahan, Esq. of McDermott, Will & Emery LLP to explore transactional options. (Paone Aff. ¶ 19.)

At no time during Kelly's tenure on the Board did Mitry or Loftus discuss retaining the Firm or Kelly. (Kelly Aff. ¶¶ 18–20.) The Firm has never had an engagement with, provided an engagement letter to, made a presentation to, or received any fee income from HVHS. (*Id.* at ¶¶ 20-22.) In the tax year beginning July 1, 2023, HVHS spent nearly $500,000 on legal counsel.[2] In the tax year beginning July 1, 2024, HVHS's legal spending jumped to approximately $2.2 million.[3] None of this money went to Kelly or the Firm—because HVHS did not perceive them to be or hire them to be counsel.

***Kelly's service on the HVHS Board of Directors***

Kelly graduated from Georgetown University Law Center in 1986 and has been practicing law for forty years. (Kelly Aff. ¶¶ 3, 5.) Kelly joined the Board of Directors of HVHS after being approached by the Board's finance chair and interviewing with Defendant Mitry and then-Board

[2] HVHS, IRS, Form 990 (2023) at p. 10, Row 11(b), *available at* https://projects.propublica.org/nonprofits/organizations/251441518/202521329349306377/full.

[3] HVHS, IRS, Form 990 (2024) at p. 10, Row 11(b), *available at* https://projects.propublica.org/nonprofits/organizations/251441518/202631359349312468/full.

Chair Lynn George. (*Id.* at ¶¶ 6, 7.) During his time on the Board, Kelly served on three subcommittees: 1) Risk Compliance; 2) Quality Management and Medical Affairs ("QM/MA"); and 3) Executive Compensation. (*Id.* at ¶ 9.) The QM/MA subcommittee dealt with routine review of provider appointments and departures. (Jerome-Zapadka Aff. ¶ 8.) On rare occasions, the subcommittee would be presented with patient safety events, but neither the Risk Compliance nor the QM/MA subcommittees were ever presented with any patient-safety events having anything to do with Chismire or drug diversion. (Paone Aff. ¶ 24; Jerome-Zapadka Aff. ¶ 8.)

Mitry had a practice of soliciting comments from all subcommittees on documents before submitting them to the entire Board for review. (Paone Aff. ¶ 23.) Despite this practice, other members of the same subcommittees as Kelly aver that they never received any information—confidential, privileged, or otherwise—regarding a) Nolan Chismire; b) drug diversion issues; c) pharmacy issues; d) fraudulent billing; e) internal investigations about drug diversions or fraudulent billing; f) Board of Nursing investigations about drug diversion; g) internal reports of drug diversion or fraudulent billing; or h) corporate policies, procedures, or strategies for dealing with reports or events, such as drug diversion or fraudulent billing. (Paone Aff. ¶ 24; Jerome-Zapadka Aff. ¶ 7.)

During his tenure on the Board, Kelly attempted three times to discuss how his healthcare practice could help HVHS. (Kelly Aff. ¶¶ 23–27.) Those e-mails involved the insurance practice of downcoding in-patient stays to observation status (*Id.* at ¶ 24), potential "lessons learned" from a specific accountable care case for an unrelated client (Dkt. No. 45-7), and an invitation to Mitry for Kelly to discuss healthcare insurance issues with HVHS (Dkt. No. 45-8). (Kelly Aff. ¶¶ 25-26.) Mitry did not respond to any of those three e-mails – either in writing or in person – or otherwise seek Kelly's legal advice or assistance. (*Id.* at ¶ 27.) HVHS only now uses these e-mails

out of context (and without noting that Mitry ignored them) in a tactical effort to concoct a legal relationship between Kelly and Mitry/HVHS.

In fact, Mitry discouraged Kelly's participation as a Board Member. He and then-Chairman of the Board Scott Elste typically rejected Kelly's suggested agenda items for Board Meetings. (Paone Aff. ¶¶ 13–16.) On several occasions, Elste and Chair Emeritus Lynn George told Paone, another Board Member, to talk to Kelly before Board Meetings to suppress his input. (*Id.* at ¶ 15.) Rather than seeking legal advice from Kelly, Mitry and HVHS had no interest in taking into account his views—legal or otherwise.

***Communications Attached to Defendants' Motion***

Defendants have cherrypicked a handful of e-mails from the time of Kelly's Board service, wrenched them from context, and stated that such communications establish an implied attorney-client relationship. With the appropriate context, however—provided in some cases via affidavits from the people who actually authored the e-mails—the communications can be seen for what they are: run-of-the-mill comments from a director fulfilling his fiduciary duties. Exhibits 1, 2, and 9 to Defendants' Motion deal with a change-of-control document drafted by HVHS's executive compensation consultant, not Kelly or Saul Ewing. (Kelly Aff. ¶¶ 88-96.) In providing comments to this document, Kelly **twice** stated he would defer to labor counsel and advised Mr. Mitry that he should run the document by **outside labor counsel** for review and comment. (*See* Dkt. No. 45-2, Kelly Aff. ¶ 92.) Neither Kelly nor Saul Ewing was retained in connection with the change-of-control document. (Kelly Aff. ¶¶ 94-95.) Advising someone (even an adversary) to seek counsel is permitted in Pennsylvania and does not create any attorney-client relationship. Pa. R. Prof. Conduct 4.3(b); Exhibit 4, Louis Wagner Affidavit ¶ 17 ("Wagner Aff.")

Exhibits 3, 4, 7, and 8 relate to Kelly's reminders to Mr. Mitry regarding Kelly's relevant legal experience in an area in which HVHS had significant problems, *i.e.*, underpayments from its healthcare insurers. (Kelly Aff. ¶ 33–42.) Mere outreach to or willingness to work with a prospective client does not create an attorney-client relationship or render it a former client when no express or implied engagement occurs, let alone on a totally unrelated adverse matter. At no time was Kelly retained by HVHS with respect to any of the issues discussed in these e-mails. (*Id.* at ¶¶ 32, 37, 41, 42.) Indeed, Mitry did not want Kelly's legal advice and viewed these touches as Kelly "drum[ming] up business" that should be ignored. (Paone Aff. ¶ 28.)

The remaining Exhibits (5, 6, 10, and 11) do not contain any legal advice from Kelly or Saul Ewing. (Kelly Aff. ¶ 73.) Rather, they show routine communications regarding Board business, including retaining outside counsel, establishing subcommittees, and editing contract language, which other non-lawyer Board Members were also asked to do. (*Id.* at ¶¶ 74-87.) Exhibits 5 and 11 relate to HVHS's search for outside counsel. (Paone Aff. ¶¶ 33-38.) Paone—the author of the e-mails that Defendants claim show HVHS seeking Kelly's legal advice—testifies that she was suggesting that Kelly be part of the group of Board Members who selected outside counsel because his expertise put him in a better position to evaluate outside counsel candidates. (*Id.* at ¶¶ 34-37.) She clearly understood that Kelly was not legal counsel, addressed him as an attorney as a matter of decorum, and knew that being part of a process to select counsel was a Board duty—rather than a lawyer duty. (*Id.* at ¶¶ 8, 12, 33-38.)

## I. LEGAL STANDARD

"[A] motion to disqualify counsel is an 'extreme sanction' which is not granted lightly." *Tiversa Holding Corp. v. LabMD, Inc.*, No. CIV.A. 13-1296, 2013 WL 6796538, at *2 (W.D. Pa. Dec. 20, 2013) (Fischer, J.) (quoting *Wise v. Washington County*, No. 10-1677, 2013 WL 5674460,

at *3 (W.D. Pa. Oct. 17, 2013) (Fischer, J.)). "Disqualification of counsel is a harsh measure, generally disfavored by the courts. It is not warranted, absent evidence of severe prejudice." *McCullough v. County of Allegheny*, No. 16-534, 2016 WL 3742341, at *1 (W.D. Pa. July 13, 2016) (citations omitted) (Bissoon, J.).

In deciding a motion to disqualify counsel, the Third Circuit directs the district court to "consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (citations omitted). "Even if a court finds that counsel violated the Pennsylvania Rules of Professional Conduct, disqualification is **not** mandatory." *Buschmeier v. G & G Invs., Inc.*, No. 02:03mc00506, 2007 WL 4150408, at *5 (W.D. Pa. Nov. 19, 2007) (McVerry, J.) (emphasis added). *See also Shade v. Great Lakes Dredge & Dock Co.*, 72 F. Supp. 2d 518, 520 (E.D. Pa. 1999) (quoting *Miller*, 624 F.2d at 1201) ("[E]ven if the court finds that an attorney violated an ethical rule, 'disqualification is never automatic.'")). Defendants erroneously state that "[i]f an attorney is found to have violated Rules 1.9 or 1.7, that attorney must be disqualified from the matter, and that disqualification must be imputed to the attorney's law firm." (Motion, Dkt. No. 44, p. 2.) This is an incorrect statement of the law in the Third Circuit. The balancing test described in *Miller* governs the Court's inquiry, and it leaves disqualification to the court's discretion based "on the facts of the particular case[.]" *Miller*, 624 F.2d at 1201.

"The moving party bears the burden of producing clear evidence that opposing counsel's ongoing representation is impermissible." *Wise*, 2013 WL 5674460, at *4 (citing *Buschmeier*, No. 2007 WL 4150408, at *5). The moving party's "burden is an exceptionally heavy one, as courts in this Circuit generally disfavor motions to disqualify as abusive litigation tactics." *Loduca v. Pichai*,

2:21-cv-01691, 2022 WL 2757681, at *1 (W.D. Pa. July 14, 2022) (Eddy, J.) (collecting cases). "Conclusory statements of harmfulness without supporting evidence are insufficient to meet the moving party's burden." *Tiversa Holding Corp.*, 2013 WL 6796538, at *2.

## ARGUMENT

### II. There Are No Conflicts of Interest Because HVHS Has Never Been Kelly's Client.

This Court has adopted the Pennsylvania Rules of Professional Conduct (the "Rules") to determine what constitutes attorney misconduct subject to disciplinary enforcement. LCvR 83.3(A)(2). The Motion alleges that Kelly has conflicts of interest as they are defined in Rules 1.7 and 1.9. A threshold requirement for the existence of a conflict of interest is a current or former attorney-client relationship. An attorney who joins a corporation's board does not automatically become the corporation's attorney. "[W]here a lawyer-director receives no legal fees from the cooperative, has never represented the cooperative and the cooperative has outside legal counsel, we do not believe that the lawyer-director becomes a legal advisor to the board merely by expressing views, in the lawyer's capacity as a director, on legal matters affecting the corporation." New York City Bar Assoc., Eth. Op. 1988-5 n.2 (July 14, 1988). Because Kelly never expressly or implicitly represented HVHS, there cannot be a former client relationship that would limit Kelly under Rule 1.9. Kelly served as an unpaid Board Member. Kelly expressed his views on matters affecting HVHS in fulfillment of his fiduciary duties to HVHS arising from his service as a Board Member. He did not, by virtue of doing so, represent HVHS as its lawyer. Because there is no conflict of interest for Kelly, there is no conflict to impute to the Firm. Neither Kelly nor the Firm should be disqualified as counsel.

### A. The Individual Defendants Lack Standing to Seek Disqualification Because Kelly Never Represented Any of Them Personally, Nor Does the Motion Allege that He Did.

Though the individual Defendants join the Motion, none of them have standing to seek Kelly's disqualification because nothing in the Motion alleges that Kelly had an express or implied attorney-client relationship with any of them or owed them fiduciary duties. The Motion is premised on Kelly's alleged former representation of and former director role at HVHS. None of the individual Defendants even sat on the Board except Mitry. Even if HVHS had been a former client of Kelly, the Rules state that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Pa. Rules of Prof. Conduct 1.13(a). "[Rule 1.13(a)] makes it clear that an attorney representing a corporation represents the corporation and not the corporation's shareholders, officers or directors." *First Republic Bank v. Brand*, 51 Pa. D. & C.4th 167, 177 (Phila. Com. Pl. Apr. 30, 2001). Kelly did not represent HVHS, its Board, or any of the Defendants individually—most of them have never even met him. Therefore, the only issue this Motion properly raises is whether Kelly represented HVHS.

### B. Kelly and HVHS Never Formed an Express Attorney-Client Relationship.

As Defendants' Motion concedes, Kelly and HVHS never formed an express attorney-client relationship. *See* Motion, Dkt. No. 44, p. 6 (implying the lack of existence of fee payments or retainers). There are no engagement letters, invoices, or anything else that would suggest a formal relationship attached to the Motion as exhibits. Rather, the exhibits consist of an assortment of e-mails, taken out of context, which will be dispensed with in turn. Given that Kelly and HVHS had no express attorney-client relationship, (Kelly Aff. at ¶ 10), the only issue the Motion raises is further narrowed to whether Kelly and HVHS had an implied attorney-client relationship—a

particularly hard thing to imply when a sophisticated client (with numerous other express attorney-client relationships) is at issue.

### C. Kelly and HVHS Never Formed an Implied Attorney-Client Relationship because None of the Four *Atkinson* Elements Are Satisfied.

Defendants have not met their burden to establish an implied attorney-client relationship between Kelly and HVHS.

> Under Pennsylvania law, an implied attorney-client relationship is shown if
> (1) the purported client sought advice or assistance from the attorney;
> (2) the assistance sought was within the attorney's professional competence;
> (3) the attorney expressly or impliedly agreed to provide such assistance; and
> (4) it is reasonable for the putative client to believe that the attorney was representing him.

*Capitol Surgical Supplies, Inc. v. Casale*, 86 F. App'x 506, 508 (3d Cir. Jan. 28, 2004) (footnote omitted) (citing *Atkinson v. Haug*, 622 A.2d 983, 986 (Pa. Super. Ct. 1993)). "The proponent of the relationship bears the burden of establishing an implied attorney-client agreement by a preponderance of the evidence." *United States v. Trombetta*, No. 13-227, 2015 WL 4406426, at *17 (W.D. Pa. July 20, 2015) (Conti, J.).

In *Atkinson*, the court upheld the grant of summary judgment to an attorney and his law firm on claims for misrepresentation and professional negligence because there was no attorney-client relationship between the attorney's associate and the associate's business partner.[4] 622 A.2d at 988. The court reasoned that an educated businessperson would not treat off-hand comments by his business partner (who happened to be a lawyer) as legal advice. *Id.* at 987. The court continued, "the fact Haug is an attorney by trade does not necessarily characterize each of his utterances as 'legal advice,' capable of being upheld as binding in the courts of this Commonwealth." *Id.* Further

---

[4] The attorney and his firm were sued under a theory of vicarious liability for the associate attorney's actions. *Atkinson*, 622 A.2d at 985.

facts militating against the finding of an implied attorney-client relationship included that "there was no express legal agreement between the parties, no fee arrangement was entered nor retainer paid, no particular legal ramifications of the deal were discussed, appellant's testimony offered no indication he asked Haug for legal counsel nor did Haug indicate he was Atkinson's attorney or attorney for the project." *Id.* at 987. Additionally, the business partner testified that he had engaged other law firms to advise him on the investment. *Id.*; *see also Handy v. Del. River Surgical Suites, LLC*, No. 2:19-cv-1028, 2024 WL 1540521, at *2 (E.D. Pa. Feb. 27, 2024), *report and recommendation adopted*, 2024 WL3552411 (E.D. Pa. Apr. 23, 2024) (noting retention of separate counsel indicative that implied attorney-client relationship does not exist). Finally, the court noted that the business partner's "subjective belief" that he had an attorney-client relationship with the associate was insufficient to raise a genuine issue of material fact. *Atkinson*, 622 A.2d at 987.

**i. HVHS Did Not Seek Legal Advice or Assistance from Kelly.**

On occasion, HVHS would ask its Board Members—including Kelly—to weigh in on various topics. As other contemporaneous Board Members swear, HVHS was not asking Kelly for legal advice. (Evans Aff. at ¶ ¶ 8-10, Paone Aff. at ¶ 14.) The first element of *Atkinson* requires, logically, that the putative client have sought legal advice, not just advice generally. *See Capitol Surgical Supplies*, 86 Fed. App'x at 507 ("No one on Capitol's behalf asked Casale for legal advice during the negotiation of the agreement."). Mitry's Declaration does not include any statement to the effect that he thought Kelly was ever acting as HVHS's attorney. Nor does it include any statement to the effect that he ever asked Kelly for legal advice on behalf of HVHS. These omissions are curious, given that Mitry's word is all that Defendants rely on to support their assertion that Kelly was HVHS's attorney. The truth is that Defendants have no credible evidence to support their argument that Kelly was HVHS's attorney because HVHS never requested that

Kelly represent it in any matter. (Paone Aff., ¶ 13.) In fact, quite the opposite occurred. Mitry frequently denied Kelly's requests to add items to Board Meeting agendas. (*Id.*) Mitry further went out of his way to avoid bringing Kelly into legal matters and completely ignored Kelly's comments and efforts to connect. (*Id.* at ¶ 16.)

**ii. Any Assistance Sought From Kelly Was In His Competence as a Businessperson, not an Attorney.**

HVHS solicited Kelly's input solely in his capacity as a Member of its Board. Like every other Board Member, Kelly brought his experience to bear in helping HVHS make business decisions. (*Id.* at ¶ 13.) Kelly's provision of comments on documents and legal issue-spotting are routine board member functions that could be performed by any director, lawyer or not. When HVHS did want to obtain legal advice—for example, in its subcommittee meetings—it did not invite Kelly because he was not its counsel. (*Id.* at ¶ 30.)

**iii. Kelly Did Not Agree to Provide Legal Assistance to HVHS.**

None of the evidence—including Mitry's Declaration—supports a finding that Kelly ever agreed to provide legal assistance to HVHS on any matter. There was certainly no formal engagement letter between Kelly and HVHS. Defendants do not cite any case law (and Relators' counsel is unaware of any) that holds that sending e-mails from one's firm e-mail address evinces an intent to enter into an attorney-client relationship with the recipient of the e-mail, particularly when it is common practice for lawyers to use their primary work e-mail for charitable service, community engagement, and other general contact. The same goes for using one's practice assistant to assist with routine administrative tasks. Defendants' attempt to use these facts as "documentary evidence" and put it in boldface type in their Motion is the definition of grasping at straws. (Motion, Dkt. No. 44, p. 4.) Further, far from expressly or impliedly agreeing to provide

legal assistance to HVHS, Kelly referred HVHS to its outside counsel. (Kelly Aff. ¶ 92; *see also* Dkt. 45-2.)

**iv. It is Unreasonable for Any Defendant to Have Believed Kelly Represented HVHS.**

It is objectively unreasonable for Mitry to have believed that Kelly represented HVHS, and Mitry is the only person on whose purported belief the Motion is based. Mitry, by his own declaration under penalty of perjury, is an educated, sophisticated businessperson—just like the business partner in *Atkinson*. For example, he served as HVHS's CEO "for over twenty-five years." (Mitry Decl., ¶ 5.) He has three degrees. (*Id.* at ¶ 4.) Given his extensive education and experience, he is "familiar with the functions [and] responsibilities . . . of the HVHS Board of Directors." (*Id.* at ¶ 5.) Mitry's claimed subjective belief that Kelly gave HVHS legal advice is unreasonable, given his few conversations with Kelly, refusal to enter into a written engagement, and decades as the CEO of a major regional hospital system and *ex-officio* Board Member.

It is further unreasonable for HVHS to have believed that Kelly represented it because at all times Kelly served on the Board, HVHS had its own in-house counsel, Sharon Loftus, Esq., and outside corporate counsel, primarily Thomas E. Boyle, Esq. of Buchanan. (Paone Aff. ¶¶ 17-18.) Buchanan was present at all Retreats and Board Meetings where HVHS's legal, transactional, and compliance matters were discussed. (Paone Aff., ¶ 19.) In the tax year beginning July 1, 2023, HVHS spent nearly $500,000 on legal counsel. *See* HVHS 2023 Form 990, *supra* n.2. In the tax year beginning July 1, 2024, HVHS's legal spending jumped to approximately $2.2 million. *See* HVHS 2024 Form 990, *supra* n.3. An organization spending at least a **half a million dollars a year** on its outside counsel is sophisticated enough to know who its counsel is—and who it is not.

Kelly and HVHS did not have an express or implied attorney-client relationship. Therefore, HVHS is not a client or a former client for the purpose of conflicts analysis. This alone is a sufficient basis for the Court to deny the Motion.

## III. There is No Former Client Conflict—Let Alone on the Same or Substantially Related Matter—under Rule 1.9.

No Defendant was ever Kelly's client, so no Defendant can be considered a "former client" for the purpose of conflicts analysis. Rule 1.9(a) provides that "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Pa. R. Prof. Conduct 1.9(a). As a matter of law, HVHS and Relators' interests may be materially adverse (even though Relators are actually seeking to support the charitable mission of HVHS by reporting fraud and patient-safety issues), but that does not matter because HVHS is not a former client. Further, Kelly never advised HVHS on the same or a substantially related matter as this litigation. There was no need for Kelly to seek informed consent of HVHS because HVHS is not a former client, let alone one that engaged Kelly on this same or substantially similar matter.

### A. HVHS Was Never a Client, so It Cannot Be a "Former Client."

A corporation that was never a client *ipso facto* cannot be a former client. As discussed in Section II, *supra*, HVHS was never a client of Kelly. Assuming, arguendo, that HVHS was a former client, this lawsuit is not the same as or "substantially related" to any matter brought before the HVHS Board, let alone advised on by Kelly.

### B. Even If HVHS Had Ever Been a Client, this *Qui Tam* Lawsuit is Not Substantially Related to Any Matter Kelly Supposedly Handled as HVHS's Lawyer.

Whether the instant lawsuit and matters Kelly addressed while on the Board are "substantially related" is only relevant if this Court finds that HVHS had an implied attorney-client relationship with Kelly. Even if such a relationship existed—which it unequivocally did not—this *qui tam* suit is not substantially related to anything Kelly addressed in his alleged "representation" of HVHS. The analysis of whether matters are substantially related under Rule 1.9 requires the court to ask the following questions:

1. What is the nature and scope of the prior representation at issue?
2. What is the nature of the present lawsuit against the former client?
3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

*Com. Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1204 (E.D. Pa. 1992). Contrary to how Defendants describe the third prong, the word "might" in the third inquiry is not read "literally." *Id.* Rather, "might" in this context means either "(a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship." *Realco Servs., Inc. v. Holt*, 479 F. Supp. 867 871-72 (E.D. Pa. 1979). Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." Pa. R. Prof. Conduct Rule 1.9, cmt. 3.

Attempting to apply Rule 1.9's test exposes two fatal flaws in Defendants' argument: they do not define the scope of Kelly's supposed representation of HVHS and they offer zero evidence

that Kelly and HVHS ever discussed drug diversion or fraudulent billing. If the scope of Kelly's representation was the few narrow matters their cherrypicked e-mails concern, then the substance of this suit is clearly not related to those matters at all. If the scope of his representation is broadened to general business advice, it still has nothing to do with compliance with DEA regulations and controlled substance handling. Further, if the scope of his alleged representation is purported to be general business advice, it is additional evidence that Defendants are erroneously equating an attorney's fulfillment of fiduciary duties as a board member with giving legal advice. Generously assuming that Defendants intend their e-mail exhibits to the Motion to illustrate the scope of representation, their argument is baseless. Three e-mails relate to Kelly telling HVHS to ask its outside labor counsel about a labor law issue. (Kelly Aff., ¶¶ 88-92.) Four e-mails are outreach to Mitry that went nowhere. (*Id.* at ¶¶ 23-27, 39-42.) One e-mail discusses a potential contract issue with Aetna, but Kelly never laid eyes on the contracts. (*Id.* at ¶¶ 35-37.) The final e-mail involves Kelly and other subcommittee members' review of a conflict waiver letter, ironically as part of Kelly's work as a Board Member to help HVHS find outside counsel (*Id.* at ¶¶ 74-79.)

The present action is a *qui tam* suit alleging that Defendants made false claims to the federal government for payment for drugs and services rendered by a nurse who was high on stolen controlled substances and that Defendants not only knew about his impairment, but also covered it up. No subcommittee or the full Board ever addressed any of the events underlying the allegations in the Amended Complaint, so there is no way that Kelly could have received any confidential or privileged information related to the allegations during his time as a Board Member. There is a telling omission in Mitry's declaration in that he neglects to identify a single occasion on which the Board or any of its Subcommittees discussed Chismire's diversion. HVHS did not attach to the Motion any e-mail from Mitry or any HVHS C-suite executive asking Kelly to review

Chismire, drug diversion, fraudulent billing of federal and state governmental healthcare programs, or any related matter. There was no topic the Board addressed that would have presented Kelly with the occasion to discuss the facts of Chismire's diversion and its effects on patients with the Board. It would have been highly unusual for Chismire's drug diversion and Defendants' cover-up of it to be discussed by Kelly and HVHS if the scope of his alleged representation was providing business advice. If HVHS were to contend that it specifically engaged Kelly to advise on years-long fraud/diversion and continue the cover-up, the crime/fraud exception to attorney-client relationships would completely override any duty of confidentiality here.

The comment to Rule 1.9 itself makes clear that general knowledge of HVHS's policies and practices do not preclude Kelly's representation of clients adverse to HVHS. Kelly and other Board Members who served contemporaneously with him all deny in sworn testimony that the Board ever even considered, much less discussed, "specific facts" relevant to this lawsuit. That makes logical sense—this lawsuit alleges a cover-up by executives at the highest levels of life-threatening problems at HVHS to advance their personal goals instead of the HVHS mission.

## IV. There is No Concurrent Conflict of Interest Under Rule 1.7 Because Kelly Did Not Receive Confidential Information Related to the Instant Lawsuit.

Defendants argue that Kelly "has a clear conflict under Rule 1.7(a)(2)[ ]" because "[i]t is obvious that, as a Director, Kelly was privy to HVHS's confidential information material to this litigation." (Motion, Dkt. No. 44, p. 22; *see also* Mitry Decl. at ¶¶ 9-11.) This is the exact sort of "[c]onclusory statement[] of harmfulness without supporting evidence" that is insufficient to carry Defendants' burden on this Motion. *Tiversa Holding Corp.*, 2013 WL 6796538, at *2. Defendants' argument fails and they have not met their burden of proof because—as testimony from other HVHS Board Members notes—Kelly was not privy to confidential information that is substantially

related to the instant litigation while a Board Member.[5] Thus, he cannot use information that he did not receive against HVHS in this litigation. Defendants' only evidence to the contrary is the self-serving declaration of Defendant Norman Mitry. Nowhere does Mitry state that he provided information about Chismire's drug diversion or the events alleged in the Amended Complaint to Kelly, to any Board Subcommittees, or to the full Board. *See generally* Mitry Decl.

Rule 1.7(a)(2) provides:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:…(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

As the comments to the Rules note, "[i]n addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by responsibilities to former clients under Rule 1.9 or by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director." Pa. R. Prof. Conduct 1.7(a)(2), cmt. 9.

In Pennsylvania, directors of non-profit organizations have duties of care, loyalty and obedience to the organization while serving on the Board.[6] *See* 15 Pa. C.S. § 5712(a); *see Kane*,

---

[5] Even if the Chismire diversion and billing fraud had been disclosed to the Board, the *qui tam* statute and the crime/fraud exception to attorney-client privilege exist to allow insiders (even lawyers) that are internally ignored to externally expose such ongoing issues for proper remediation. "[T]o the extent that state law permits a disclosure of client confidences, such as to prevent a future or ongoing crime or fraud, then the attorney's use of the *qui tam* mechanism to expose that fraud should be encouraged, not deterred." *United States ex rel. Doe v. X Corp.*, 862 F. Supp. 1502, 1507-08 (E.D. Va. 1994).

[6] Non-profit directors (including attorney-directors) in Pennsylvania also have a duty of obedience to advance the non-profit's mission. *See Comm. by Kane v. New Foundations, Inc.*, 182 A.3d 1059, 1067 (Pa. Commw. Ct. 2018) (stating that directors of nonprofits have fiduciary duties of loyalty and obedience). "It is axiomatic that the Board of Directors is charged with the duty to

182 A.3d at 1066-67. After their time on the Board concludes, only the duty to not disclose or profit from confidential information continues. *See In re Mortgage & Realty Trust*, 195 B.R. 740, 751 (Bankr. C.D. Cal. 1996). As such, the only duty to HVHS that may materially limit Kelly's representation of Relators is his duty not to disclose confidential information received while a Board Member. This duty, however, is not at issue here because Kelly did not receive confidential information that was material to the underlying lawsuit here. (Kelly Aff. ¶ 71; Paone Aff. ¶ 24; Jerome-Zapadka Aff. ¶¶ 8, 9.)

Further, the cases that Defendants cite in support of their argument that Kelly is disqualified under Rule 1.7(a)(2) are all easily distinguishable because the courts in those cases found the attorney at issue had received confidential information substantially related to the underlying lawsuit during their service on the Board, which did not happen here. *See EEOC v. Luby's Inc.*, 347 F. Supp. 2d 743, 749 (D. Ariz. 2004) (holding that, when no actual access to confidential information of the underlying suit occurs, a former board member can represent an adverse party).

First, the court in *Berry v. Saline Memorial Hospital* disqualified an attorney that previously sat on the board of a hospital in a FOIA lawsuit where that attorney's firm was now suing the hospital and the attorney had been "privy to confidential and privileged information about the hospital's quality assurance activities and the peer reviews conducted by the medical staff[,]" and "served as Chairman of" a committee that "relayed concerns of the medical staff to

---

ensure that the mission of the charitable corporation is carried out." *Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 715 N.Y.S.2d 575, 593 (N.Y. Sup. Ct. 1999). A non-profit director must "be faithful to the purposes and goals of the organization, since unlike business corporations, whose ultimate objective is to make money, nonprofit corporations are defined by their specific objectives[.]" *Id.* (quotation omitted). HVHS's mission is "to improve the health and well-being of all people in the communities we serve." Allegheny Health Network, *Mission, Vision, Values, & Imperatives*, https://www.heritagevalley.org/about/mission-vision-values-imperatives. Investigating and remediating Chismire's diversion—and management's enabling of it—furthers HVHS's mission far more than ongoing fraud and concealment.

the board about the quality assurance programs." 907 S.W.2d 736, 738 (Ark. 1995). Notably, the court concluded "[a]fter the lawyer's term on the board ends, the lawyer should not take any action to the detriment of the hospital when that action is *based upon confidential information the attorney gained during the fiduciary relationship.*" *Id.* at 739 (emphasis added).[7]

Here, even applying the non-binding rule in *Berry*, HVHS has not shown that Kelly received confidential information during his tenure on the Board that substantially related to the instant lawsuit. *Id.* at 739. Defendants argue that Kelly "is certainly a witness for the retention and change-of-control agreements alleged in the Amended Complaint, as well as for the various patient safety and compliance processes that he participated in." (Dkt. No. 44, p. 23.) However, there are no allegations in the Amended Complaint regarding any retention or change-of-control agreements. In any event—as shown by the attached affidavits—numerous other Board witnesses are available to discuss any agreements or patient-safety/compliance issues that may tangentially be relevant, *i.e.*, to show individual Defendants' financial incentives and that the Chismire allegations never went to the Board. For the reasons explained *supra* in Section III.B, the instant *qui tam* lawsuit is not relevant to any potential duty Kelly had to the Board because the Board never received any information substantially related to the events of the Amended Complaint.

Moreover, in *Berry*, the Arkansas Supreme Court expressly advised against the reading Defendants are arguing for in the instant Motion and cabined the holding of that case to the facts directly before it. *Berry*, 907 S.W.2d at 739 ("The holding in this case must be read in context of

---

7 Interestingly, in *Berry*, the law firm in question had brought two lawsuits against the hospital which he formerly served as a board member: a personal injury case and a FOIA suit. *Id.* at 738. The motion to disqualify was brought in the FOIA suit, presumably, because, during his tenure on the board, the attorney "was privy to confidential and privileged information about the hospital's quality assurance activities and the peer reviews conducted by the medical staff[,]" the subject of the FOIA suit.

this case only.") The Arkansas Supreme Court advised "[t]he Model Rules of Professional Conduct are not really designed for disqualification trials; rather, they are designed for regulating conduct through the Committee on Professional Responsibility. The rules can be subverted when they are invoked by opposing parties as procedural weapons." *Id.*

*In re Mortgage & Realty Trust* similarly found that "the fiduciary duties of a director or trustee terminate when the director or trustee ends his or her tour of duty[,]" but "[t]he duty to protect and preserve confidential information received during service as a director continues after the director leaves the board." 195 B.R. at 751. Thereafter, the court presumed a substantial relationship where an attorney at a firm had been on the Board of Directors of a debtor corporation who was sued by a creditor—and the basis of the contract at issue had been approved while the attorney was a member of the Board. *Id.* at 753. The court went on to note that the creditor "has pointed to some confidential information in [the attorney's] possession, that he has discussed with his litigation partner handling this case." *Id*. As explained above, Kelly did not have access to any confidential information substantially relating to this lawsuit (nor was there a risk that such confidential information would normally have been obtained by Kelly as a Board member) because it was Defendants' design that no such information be disclosed to anyone, let alone the HVHS Board.

*Filippi v. Elmont Union Free School District Board of Education* is also easily distinguishable because that case dealt with a current member of the school board who was also an associate at a firm who represented a plaintiff suing the school in a Title VII discrimination case. 772 F. Supp. 2d 295, 298 (E.D.N.Y. 2010). The court highlighted that the attorney at issue "was a member of the Board during the period in which plaintiff's claims against defendants arose. Specifically, Ferrigno was a member of the Board in October 2008, when the Morelli Firm wrote

a letter to the Board, including Ferrigno [the conflicted attorney], alerting its members to [plaintiff's] grievance." *Id.* at 306. Thus, the court concluded that there was a substantial relationship between the attorney's current board service and her employment at the law firm representing plaintiff. *Id.* Here, in contrast, Kelly departed the Board in October 2024, thus ending his duties of loyalty and care to HVHS. Moreover, the instant lawsuit is not substantially related to any confidential information that Kelly may have received while serving on the Board because, as alleged in the Amended Complaint, Defendants purposefully concealed the activities and events alleged in the lawsuit. (Am. Compl., Dkt. No. 19, ¶¶ 10-13.)

Finally, Defendants argue that, similar to *Am. Dredging Co.*, Kelly had "substantial influence" over HVHS. (Motion, Dkt. No. 44, p. 23.) First, *Am. Dredging Co.* applies the Canons of the Code of Professional Responsibility, which were replaced by the Rules of Professional Conduct in 1988. *See Commonwealth v. Turrell*, 584 A.2d 882, 885 n.2 (Pa. 1990). Second, Defendants rely on language interpreting the former canon that a lawyer should avoid even the appearance of impropriety. *See Am. Dredging Co.*, 389 A.2d at 573 (relying on "Ethical Consideration 9-2 and interpretation of Canon 9); *see also DeMarco v. Shoemaker-Skanska*, No. 1323 EDA 2023, 2024 WL 1091712, at *5 (Pa. Super. Ct. March 13, 2024) (noting that appellant's attempts to invoke the "outdated standard of 'appearance of impropriety' previously used in Canon 9 of the Code of Professional responsibility . . . failed to demonstrate a violation under current Rule 1.7."). Under the current rules, as discussed above, Kelly has not violated his duty to not disclose confidential information from his time on the Board because he received no confidential information which is substantially related to the underlying lawsuit here. As such, no concurrent conflict exists under Rule 1.7(a)(2), and Defendants' Motion must be dismissed.

## V. Applying the Third Circuit's Disqualification Balancing Test, Public Policy Considerations Outweigh the Value of Using Disqualification to Enforce Applicable Disciplinary Rules.

Defendants' positions are bad policy. First, granting the Motion would reward bald gamesmanship by Defendants in filing a factually unsupported motion to disqualify counsel. Second, it would lend credence to the incorrect assertion that attorneys cannot report ongoing fraud by their clients, former clients, or as whistleblowers, giving wrongdoers cover. Even if Kelly had become aware of Defendants' fraud while on the Board, he would not be prohibited from taking action to stop an ongoing fraud (particularly when it also undermines the patient-safety mission of non-profit HVHS to financially benefit individual wrongdoers). Third, to accept Defendants' false equivalence between board service and legal representation would deter attorneys from serving on boards, though they have unique expertise and education that allows them to provide valuable services to non-profit organizations. None of these policies deserve this Court's seal of approval.

### A. Relators Would Be Prejudiced By Being Deprived of Their Chosen Counsel Post-Unsealing.

An important consideration in determining whether to disqualify counsel is the fact that doing so deprives the plaintiffs of the counsel they chose. "Deference is given to the choice of counsel made by the non-moving party because disqualification not only 'robs one's adversary of her counsel of choice, but also because of the risk . . . one could subvert the ethical rules in an attempt to use them as a procedural weapon.'" *Tiversa Holding Corp.*, 2013 WL 6796538, at *2 (quoting *Wise*, 2013 WL 5674460, at *3).

The consideration of Relators' choice of counsel is especially salient in a *qui tam* case where Relators' current counsel represented them throughout the time the case was under seal. Knowledge of what occurred during the seal period cannot be assumed by substitute counsel. Further, to sever the relationship between Relators and the Firm now would prejudice them

severely, given the Firm's nearly seventeen (17) months of investigation and analysis, including consultation with experts, that current counsel has undertaken. Lastly, the attorney-client relationship is founded upon trust. Relators and their current counsel have built up trust, which is especially important in a whistleblower case like this one where Defendants retaliated against Relators. To disqualify Kelly and the Firm would not only be contrary to law, but also force Relators to start from square one. That may be what Defendants seek by filing the Motion. It is not an acceptable reason to disqualify counsel.

### B. Accepting Defendants' Position that an Attorney Serving as an Organization's Board Member Represents the Organization Would Discourage Attorneys from Voluntarily Serving their Communities.

Attorneys commonly serve on the boards of non-profit organizations as unpaid volunteers. (Kelly Aff. at ¶¶ 97-100). For instance, the Allegheny County Bar Association has a program called "Lawyers on Board" that trains junior attorneys to serve on nonprofit boards in western Pennsylvania.[8] To hold that an attorney's participation on a board constitutes giving legal advice would have a chilling effect on board service by attorneys, which would be detrimental to non-profits and the people and communities they serve.

## CONCLUSION

Defendants have failed to meet their exceptionally heavy burden of producing clear evidence to warrant the extreme sanction of disqualifying Relators' attorneys. Relators respectfully request that this Court deny Defendants' Motion to Disqualify Attorney Charles Kelly and Law Firm Saul Ewing LLP as Counsel with prejudice.

Dated: July 31, 2026 Respectfully submitted,

---

[8] Allegheny County Bar Assoc., *Lawyers on Board*, https://www.acba.org/?pg=lawyersonboard

SAUL EWING LLP

*/s/ Joseph A. Valenti*
Joseph A. Valenti
PA ID No. 306788
*joe.valenti@saul.com*
T. Patrick Martin
PA ID No. 338716
*patrick.martin@saul.com*
Charles Kelly
PA ID No. 51942
*charles.kelly@saul.com*
Sophia Sulzer
PA ID No. 333681
*sophia.sulzer@saul.com*
One PPG Place, 30th Floor
Pittsburgh, PA 15222
Telephone: (412) 209-2500

*Counsel for Relators/Plaintiffs*
*Jennifer Duckett and Samantha Gallo*

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on July 31, 2026, the foregoing document was filed electronically with the Court. Notice of this filing will be sent to all counsel of record via the Court's electronic filing system.

*/s/ Joseph A. Valenti*